**Arlene VIOLET, Attorney General of the State of Rhode Island and the Rhode Island Division of Public Utilities and Carriers, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**New England Power Company, Intervenor.**

No. 85–1734.

United States Court of Appeals, First Circuit.

Heard April 11, 1986.

Decided Sept. 5, 1986.

Sheldon Whitehouse, Sp. Asst. Atty. Gen., with whom Arlene Violet, Atty. Gen., Providence, R.I., was on brief, for petitioners.

Joseph S. Davies, with whom John N. Estes, III, William H. Satterfield, General Counsel, and Joshua Z. Rokach, Washington, D.C., were on brief, for respondent.

Edward Berlin, with whom Andrew D. Weissman, Kenneth G. Jaffe and Swidler & Berlin, Chartered, Washington, D.C., were on brief, for intervenor.

Before CAMPBELL, Chief Judge, and ALDRICH and COFFIN, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

The State of Rhode Island petitions for review of an order of the Federal Energy

Regulatory Commission ("FERC" or "Commission") permitting intervenor New England Power Company ("NEP") to recover, by passing on to consumers, the costs it incurred as a participant in the construction of the Pilgrim II nuclear power plant during the last 15 months before the project was abandoned. We affirm the FERC order.

### I.

In 1972 NEP, along with nine other utilities, entered into a Joint Ownership Agreement with the Boston Edison Company ("Edison" or "BEC") for the construction and operation of the Pilgrim II nuclear generation unit in Plymouth, Massachusetts. Edison, the lead owner, retained a 59 percent interest in the project. NEP's interest was initially 9.97 percent, later increased to 11.16 percent.

The Joint Ownership Agreement gave Edison control over essentially all aspects of the project, including design, construction, operation, maintenance, cancellation, termination, suspension, and shutdown of the unit. The Agreement also limited Edison's liability to other joint owners to "damages resulting from a deliberate violation of the agreement occurring pursuant to authorized corporate action by Edison."

On September 23, 1981, Edison announced that it was cancelling the Pilgrim II project, citing as reasons the increased costs due to licensing delays, regulatory requirements, and uncertainty surrounding various other aspects of the project. In a rate proceeding brought by Edison, the Massachusetts Department of Public Utilities ("MDPU") ruled that project uncertainty had become intolerably high by June 30, 1980, and that Edison was imprudent in not

cancelling the project by that date. It accordingly refused to allow Edison to recover its project expenditures from July 1, 1980 until the cancellation. *Boston Edison Co.,* MDPU 906 (1982), *aff'd, Attorney General v. Department of Public Utilities,* 390 Mass. 208, 455 N.E.2d 414 (1983).

In 1982, NEP filed a wholesale rate increase request with FERC,[1] seeking, in part, to recover its Pilgrim II investments. In 1983, NEP, Rhode Island, and the MDPU entered into a stipulation whereby NEP agreed not to contest the MDPU's finding that Edison had acted imprudently by continuing the Pilgrim II project beyond June 30, 1980. The stipulation preserved NEP's right to argue that its own conduct was prudent and that Edison's imprudence should not be imputed to NEP. *See New England Power Co.,* 23 FERC ¶ 61,314 (1983). At the hearing on NEP's rate request, therefore, the sole issue addressed was NEP's right to recover its investment in the Pilgrim II plant for the period of June 30, 1980 to September 23, 1981. No party challenged NEP's right to recoup investments made prior to that period.[2]

The administrative law judge hearing the case ruled against NEP. Focusing on the negotiations culminating in the signing of the 1972 Joint Operating Agreement, the ALJ found that NEP had been imprudent in giving Edison sole control over decision-making involving the plant, and in agreeing to the clause limiting Edison's liability to those damages resulting from deliberate violations of the agreement. He concluded, in essence, that since NEP had been imprudent in entering into these terms in the Agreement, and since Edison had been found imprudent in continuing expenditures in the plant after June 30, 1980, "[i]t

---

1. NEP is the interstate generation and transmission subsidiary of the New England Electric System. Through its retail affiliates, NEP sells electricity in Massachusetts, Rhode Island, and New Hampshire. As a wholesaler of electric power, it is subject to the jurisdiction of FERC. Federal Power Act, 16 U.S.C. §§ 791a *et seq.* (1982).

2. The parties had earlier agreed that NEP would not request reimbursement of the unamortized

portion of its Pilgrim II investment, consistent with Commission policy. *See New England Power Co.,* 8 FERC ¶ 61,054 (1979), *aff'd sub nom. NEPCO Municipal Rate Com. v. FERC,* 668 F.2d 1327 (D.C.Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982) (utility may recover from its ratepayers its prudent expenditures for a cancelled plant, but may not earn a return for the time it takes for the utility to recover the expenditures).

follows that NEP's investment in Pilgrim II after June 30, 1980 was not prudently made." *New England Power Co.*, 27 FERC ¶ 63,037, at 65,170 (1984).[3]

The Commission reversed. *New England Power Co.*, 31 FERC ¶ 61,047 (1985). It ruled that the ALJ had erred in focusing on the terms of the 1972 agreement rather than on the prudence of NEP from July 1, 1980 to September 23, 1981, the challenged period. The Commission found that NEP had in fact been prudent in continuing to incur expenses during 1980–1981. Accordingly, the Commission ordered that NEP be permitted to amortize the requested portion of its Pilgrim II investment.

Rhode Island and the MDPU filed a petition for rehearing, which was denied. 62 FERC ¶ 61,112 (1985). This petition for review, brought by Rhode Island alone, followed.

## II.

Under the Administrative Procedure Act, we may set aside a FERC order only if we determine that it is arbitrary, capricious, an abuse of discretion, or in excess of statutory authority. 5 U.S.C. § 706(2) (1982). We thus look to see whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). All findings of the Commission, if supported by substantial evidence, are conclusive upon us. Federal Power Act, 16 U.S.C. § 825*l*(b) (1982); *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 766, 88 S.Ct. 1344, 1359, 20 L.Ed.2d 312 (1968). With this deferential standard in mind, we examine the arguments made by Rhode Island.

The Commission, in exercise of its power "to devise methods of regulation capable of equitably reconciling diverse and conflicting interests," *Mobil Oil Corp. v. Federal Power Commission*, 417 U.S. 283, 331, 94 S.Ct. 2328, 2356, 41 L.Ed.2d 72 (1974) (*quoting Permian Basin Area Rate Cases*, 390 U.S. at 767, 88 S.Ct. at 1360), has applied the "prudence" test to determine the recoverability of a utility's expenses. Under this test, NEP is entitled to recover its costs from consumers if it acted "prudently" in incurring those costs, or stated conversely, NEP may not recover its costs if those costs were incurred "imprudently." *See Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 289 n. 1, 43 S.Ct. 544, 547 n. 1, 67 L.Ed. 981 (1923) (Brandeis, J., concurring); National Regulatory Research Institute, *The Prudent Investment Test in the 1980s* (1985) (collecting cases). That NEP invested in a plant that did not become operational does not, by itself, make its investment imprudent. In an industry that combines long lead times for plant construction with wide fluctuations in supply and demand, constant changes in the regulatory environment, and unpredictability in the availability and price of alternative sources of fuel, some projects that seem prudent at the time when costs are incurred may appear, some years later, in hindsight, to have been unnecessary or inadvisable. The prudence of the investment must be judged by what a utility's management knew, or could have known, at the time the costs were incurred.

In its order below, the Commission reviewed the FERC and judicial decisions outlining the prudence standard, summarizing the standard as follows:

> [M]anagers of a utility have broad discretion in conducting their business affairs and in incurring costs necessary to provide services to their customers. In performing our duty to determine the prudence of specific costs, the appropriate test to be used is whether they are costs

---

**3.** The ALJ found that:

> [NEP's] acceptance of the terms of the Agreement, in general, was imprudent. Its acceptance of the exculpatory provision of Section 14 of the Agreement was imprudent. Its failure to sue BEC cannot be held imprudent in the face of that exculpatory provision, but, absent that provision, NEP's failure to sue has not been shown to be prudent.

27 FERC at 65,170.

which a reasonable utility management (or that of another jurisdictional entity) would have made, in good faith, under the same circumstances, *and at the relevant point in time.* We note that while in hindsight it may be clear that a management decision is wrong, our task is to review the prudence of the utility's actions and the costs resulting therefrom based on the particular circumstances existing at the time the challenged costs were actually incurred, or the time the utility became committed to incur those expenditures.

31 FERC at 61,084 (1985) (emphasis supplied).

Petitioners argue that this definition of prudence is too narrow. They believe that, in determining prudence, the Commission should have taken into account the wisdom of NEP's 1972 agreement allowing Edison to take charge, and absolving Edison from liability for all except deliberate breaches of the Joint Agreement. Petitioners contend that, as the ALJ found, NEP became "committed to incur" the Pilgrim II expenses at the time the Joint Operating Agreement was signed, and thereafter had no recourse against Edison, even if Edison imprudently managed the project. Since under the terms of the parties' stipulation Edison acted imprudently in continuing the project beyond June 30, 1980, NEP's expenses after that date should, in petitioner's view, be disallowed as imprudent as well.

The Commission rejected this approach as neither "fair, equitable, [n]or logical." 31 FERC at 61,085. It saw the question before it as whether *on July 1, 1980 and thereafter* NEP was prudent in continuing to invest in the Pilgrim II plant; that is, whether a reasonable utility management could believe at that time that its ratepayers were best served by remaining in the project.

We need not decide whether the prudence doctrine would have been violated were this record to establish that the 1972 contract was both ill-advised when made and a cause of subsequent injury to NEP.

The record here contains little if any evidence that after 1980 NEP would have pursued any different course in respect to Pilgrim II had a different contract been in place. In the absence of more tangible evidence of a causal link between the allegedly imprudent contract and the costs NEP now seeks to recover, we cannot say that the Commission erred as a matter of law in refusing to focus on the events predating July 1, 1980.

Similarly, it seems mainly speculative that if BEC's formal liability had extended beyond that for deliberate violations of the agreement, NEP would have been able to recoup from BEC all or part of the costs it seeks to impose upon its ratepayers. Not only is it unclear what a "properly drafted" clause would have contained (and whether BEC, in the interest of its own ratepayers, would have accepted a different clause), it is unclear what rights NEP, as a minority member of the joint venture, could have claimed on the present facts.

The ALJ and Rhode Island have pointed to no evidence in the record of industry practice, or from industry experts, tending to show that a reasonably prudent utility, before taking a minority position in such a joint venture, could or would have insisted upon greater rights of indemnification. More important, it is not apparent that in the absence of the allegedly imprudent liability waiver, NEP would have been able to recover from BEC the costs it incurred on Pilgrim II after 1980. On this record, the Commission could view as merely speculative the ALJ's suggestions that a different sort of contractual arrangement would have enabled NEP to have secured present redress from BEC. We ourselves cannot fill in these gaps, as they involve matters well outside common knowledge, requiring specialized insight into the operations of public utilities. Consequently, we reject petitioners' claim that the Commission erred in failing to find NEP imprudent for not positioning itself to sue BEC successfully for its post–1980 Pilgrim II costs.

Turning to the Commission's finding that NEP was prudent in continuing its involve-

ment with Pilgrim II after 1980, we find substantial evidence in support of that finding.

NEP presented unchallenged evidence that in the late 1980s it was very concerned about the unstable market for imported oil, and was under considerable pressure from the federal government to shift to alternate power sources. During that same period, NEP was projecting considerable growth in demand for power, at a time when it had been forced to cancel two of its own nuclear power plants. As a result, the Pilgrim II project seemed quite important to NEP. Concerns arising in the mid–1970s about Edison's ability to finance the project had largely receded by the end of the decade, and while the project encountered numerous licensing difficulties, by mid–1980 Edison had reduced expenditures on the project to the point where NEP's share of the incremental costs in the relevant time period was approximately $187,000 per month.

The evidence suggests that NEP never blindly deferred to BEC's handling of Pilgrim II. Rather, it seems, NEP carefully followed the progress of the plant even prior to 1980. Once NEP became aware that BEC was encountering financial difficulties, it called a meeting of the joint owners to discuss the status of the project. Thereafter, NEP intensified its monitoring of the plant's construction, and as the Commission found, initiated periodic audits. These audits provided NEP with the type of information from which it could have reasonably concluded that the continuation of the project was in its ratepayers' best interest.

Given this evidence, we have little difficulty discerning substantial support for the Commission's finding that NEP's choice to remain in the venture after June 30, 1980 was prudent.

We find no merit in Rhode Island's remaining arguments. Insofar as the state maintains that the Commission improperly placed the burden of proof regarding this recovery of costs on the ratepayers, we find little or no support for this contention.

The Commission expressly indicated that the burden rested on NEP, and NEP presented considerable and unchallenged evidence regarding its prudence. Indeed, the only witness in opposition to NEP's claim for recovery of its costs did not specifically disagree with the conclusion that NEP had been prudent in respect to its continued association with the project after June 1980.

*The petition for review is denied and the order of the Commission enforced.*

