CONNECTICUT LIGHT AND POWER COMPANY *v.* DEPART-
MENT OF PUBLIC UTILITY CONTROL ET AL.
(13924)

DIVISION OF CONSUMER COUNSEL *v.* CONNECTICUT
LIGHT AND POWER COMPANY ET AL.
(13927)

PETERS, C. J., SHEA, GLASS, HULL and BORDEN, Js.

Argued October 3—decision released December 11, 1990

*Walter F. Torrance, Jr.,* and *Philip M. Small,* with whom was *Cynthia Brodhead,* for the appellant in the first case, appellee in the second case (Connecticut Light and Power Company).

*Valerie J. Bryan,* for the appellant in the second case, appellee in the first case (division of consumer counsel).

*Robert S. Golden* and *Tatiana D. Sypko,* for the appellee in both cases (department of public utility control).

PETERS, C. J. These consolidated appeals, arising out of the decision of an administrative regulatory agency to adjust a public utility company's rates because of a finding of imprudent sales of generating capacity, raise questions about the standard of judicial review and the substantiality of the evidence supporting the agency's

action. These proceedings began in August, 1987, with a request by the plaintiff, Connecticut Light and Power Company (CL&P)[1] for an amendment to its rate schedules. After extensive hearings, the defendant department of public utility control (DPUC) issued its decision to exclude $17,542,000 from CL&P's rates. Administrative appeals to the trial court were taken both by CL&P, claiming that the exclusion was improper, and by the Office of Consumer Counsel (OCC),[2] formerly the Division of Consumer Counsel, claiming that the exclusion should have been higher.[3] The trial court consolidated and then dismissed both appeals, thereby sustaining the DPUC's decision. CL&P and the OCC each individually appealed the trial court's decision to the Appellate Court. We transferred the appeals to this court in accordance with Practice Book § 4023 and now affirm the judgments of the trial court.

I

The present proceedings have their origins in a 1985 application for approval of amended rate schedules for 1988 that CL&P filed with the DPUC pursuant to Gen-

---

[1] The plaintiff is an electric public service company, under General Statutes § 16-1 (a) (4), which defines "[p]ublic service company" to include "electric . . . companies, owning, leasing, maintaining, operating, managing or controlling plants or parts of plants or equipment . . . ."

[2] General Statutes § 16-2a designates the office of consumer counsel as the "advocate for consumer interests in all matters which may affect Connecticut consumers with respect to public service companies." Section 16-2a authorizes the OCC to "appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved." Accordingly, the DPUC had designated the OCC as a party to the CL&P rate increase hearings in this case.

[3] In addition to the OCC, the DPUC also designated its prosecutorial division, the Connecticut siting counsel and other state agencies as additional parties. Only CL&P, the OCC and the DPUC are parties to these appeals.

eral Statutes §§ 16-19 and 16-19b. This application led to the DPUC's approval and adoption of settlement agreements (Settlement Agreements) between CL&P, the OCC, the DPUC's prosecutorial division, and the Attorney General. Part III of the Settlement Agreements enumerated conditions pertaining to the application of General Statutes § 16-19aa.[4] This section requires the DPUC in all rate proceedings to determine whether an electric public service company has generating capacity in excess of that which provides a net economic benefit to the company's customers. The section further directs the DPUC to exclude the costs of such "excess generating capacity" from a company's rate base.

On August 7, 1987, CL&P filed the present application for approval of amended rate schedules with the DPUC. A primary issue in the ensuing proceedings was the manner in which the large costs of the Millstone III nuclear power plant would be allocated between CL&P's stockholders and customers. In addressing this issue, the DPUC for the first time applied § 16-19aa

---

[4] General Statutes § 16-19aa provides in relevant part: "EXCESS GENERATING CAPACITY. EXCLUSION OF COSTS ASSOCIATED WITH. (a) During each proceeding on a rate amendment under section 16-19 proposed by an electric public service company, as defined in section 16-1, having more than seventy-five thousand customers, the department of public utility control shall (1) review the facilities utilized by the company for the generation and transmission of electricity, (2) determine the level of the company's reserve capacity, (3) determine the level of reserve capacity which would provide a net economic benefit to customers of the company, provided the department shall also consider the New England Power Pool reliability standard, the state energy policy as stated in section 16a-35k and any other factors which the department deems appropriate and adjust such level accordingly and (4) exclude from the company's rates, in a manner which shall provide the optimal short-term and long-term benefits to customers of the company, the costs associated with generating facilities which provide reserve capacity in excess of the level, including any adjustments, determined by the department under subdivision (3) of this section."

and Part III of the Settlement Agreements. On the basis of evidentiary hearings, the DPUC found, in a decision issued on February 4, 1988, that subsequent to the enactment of § 16-19aa in 1985 and the 1986 Settlement Agreements, CL&P had greatly increased its sales of short-term generating capacity[5] "in an effort to shed excess capacity."

The DPUC conducted two alternate forms of analysis with respect to CL&P's excess capacity sales. In one analysis, conducted pursuant to § 16-19aa and Part III of the Settlement Agreements (the excess capacity analysis), the DPUC determined that CL&P had "excess capacity" of 254 megawatts on its system. The DPUC concluded that if it were to adjust CL&P's rates accordingly, it would have excluded $12,741,220 in costs associated with the 254 megawatts of "excess capacity." In its alternative analysis (the capacity sales analysis),[6] the DPUC concluded that CL&P's increased sales of short-term capacity were made "with the obvious intent of avoiding excess capacity adjustments to this rate application," that CL&P had sold the capacity in question at prices that were "much less than was possible," and that "choosing to sell only the cheapest units for short periods was not a reasonable and prudent decision." Choosing the capacity sales analysis as

---

[5] Electrical generating capacity is classified according to the characteristics of the generating unit that produces it. Baseload units, such as nuclear power and coal-powered plants, have high capital costs but very low fuel, or variable, costs and are designed to run as many hours per year as possible to distribute their costs over the largest number of generation hours. Peaking units, such as gas turbines, have very low capital costs but high fuel costs. These units are typically run infrequently during the year, such as when heavy electrical demand exists. In between base load and peaking units are oil-fired, intermediate units.

[6] The DPUC conducted its capacity sales analysis pursuant to its statutory mandate in General Statutes § 16-19e (a) (5) to ensure that the level and structure of rates charged utility customers reflect prudent and efficient management. See footnote 18, infra.

the more appropriate alternative in the circumstances of these proceedings, the DPUC excluded $17,542,000 from CL&P's rates.[7]

CL&P's appeal to the trial court challenged both the excess capacity and capacity sales analyses. Following the DPUC's denial of its petition for reconsideration of the excess capacity analysis, the OCC also appealed to the Superior Court, challenging only the excess capacity analysis. The trial court consolidated the appeals, and dismissed them both on the ground that the DPUC rate order was neither unjust nor unreasonable.

In its appeal to this court, CL&P contends that the trial court invoked too restrictive a standard of review, and that, on proper examination, the DPUC rate order cannot be sustained on either the excess capacity analysis or the capacity sales analysis. The OCC's appeal challenges the former analysis only. We conclude that the judgment of the trial court on CL&P's appeal must be sustained because the DPUC's decision to exclude $17,542,000 from CL&P's rates in accordance with its capacity sales analysis was supported by substantial evidence.[8]

## II

The first issue raised by CL&P's appeal is whether the trial court applied the correct standard of review in rejecting its challenge to the substantive merits of the decision of the DPUC. Pursuant to General Statutes § 16-35, the provisions of General Statutes § 4-183 of the Uniform Administrative Procedure Act determine the scope of judicial review for administrative appeals

---

[7] The DPUC reserved the right to invoke either analysis in subsequent cases.

[8] Because we affirm the trial court's judgment sustaining the DPUC's capacity sales analysis, we do not consider the claims raised by CL&P and the OCC regarding the DPUC's excess capacity analysis.

from decisions of the DPUC. *Connecticut Natural Gas Corporation* v. *Public Utilities Control Authority,* 183 Conn. 128, 133–34, 439 A.2d 282 (1981). In its memorandum of decision, the trial court correctly referred to § 4-183 as governing the appeal before it, but did not expressly pursue any of the specific standard of review provisions of § 4-183 (g).[9] Instead, relying on our decision in *Woodbury Water Co.* v. *Public Utilities Commission,* 174 Conn. 258, 263, 386 A.2d 232 (1978), and our application therein of the test that the United States Supreme Court enunciated in *Federal Power Commission* v. *Hope Natural Gas Co.,* 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944) (the *Hope* test), the trial court dismissed the appeals on the ground that the DPUC's rate order was neither unjust nor unreasonable and that judicial inquiry was therefore at an end.[10] CL&P argues that the trial court should not have applied the *Hope* test, while the DPUC and the OCC contend that judicial review of the rate order under the *Hope* test was correct. We agree with CL&P.

The issue before the Supreme Court of the United States in *Hope* was the interpretation of § 4 (a) of the federal Natural Gas Act of 1938, 52 Stat. 821, 15 U.S.C. § 717, which provides that gas rates "shall be just and

[9] General Statutes (Rev. to 1989) § 4-183 (g) provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decisions of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."

[10] The court also stated, without any elaboration, that the record supported the DPUC's decision as "logical and rational." See footnote 14, infra.

reasonable." Noting that Congress had provided no formula by which such rates were to be determined, the court stated that the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks, and should also be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. Id., 603. The court ultimately concluded that "[u]nder the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. . . . If the total effect of a rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end." Id., 602. The court also noted that the statutory standard met federal constitutional requirements for a nonconfiscatory rate order. Id., 607.

CL&P argues that because it has not raised a constitutional confiscation claim in this case, the trial court erred in applying the *Hope* test.[11] CL&P correctly notes that, in *Woodbury,* this court applied the *Hope* test solely to a party's claim that the rates in question were confiscatory. In response, the DPUC and the OCC maintain that General Statutes § 16-19e (a) (4)[12] embod-

[11] CL&P's initial administrative appeal to the Superior Court raised various constitutional claims. CL&P has not, however, pursued any of those claims in this appeal and we do not, therefore, consider them.

[12] General Statutes § 16-19e (a) provides in relevant part: "In the exercise of its powers under the provisions of this title, the department of public utility control shall examine and regulate the transfer of existing assets and franchises, the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles . . . (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable . . . ."

ies the *Hope* test as a matter of statutory regulation and that the trial court's application of that test was therefore correct. Specifically, the DPUC contends that as long as the rate order meets the "just and reasonable" requirement allegedly embodied in § 16-19e (a) (4), and the order is supported by record evidence, it must be sustained. In a slightly different vein, the OCC contends that in order to satisfy the § 4-183 (g) prerequisite that an appellant must make a showing of prejudice to its "substantial rights" before a court can modify or reverse an agency decision, CL&P must prove that the rate order violates § 16-19e (a) (4) because it is "unjust and unreasonable." Despite these differences in emphasis, the arguments of both the DPUC and the OCC lead to the same result, a replacement of the broader judicial review standard contained in § 4-183 (g) with the narrow review standard allegedly contained in § 16-19e (a) (4). We are unpersuaded that the legislature intended to afford utility companies so little opportunity to challenge adverse rate regulation.

It is true that § 16-19e (a) (4), in identifying the various factors that the DPUC must consider when it establishes rates for public service companies, uses language that tracks, almost verbatim, the language that the United States Supreme Court used in *Hope* when it interpreted the "just and reasonable" requirement under the Natural Gas Act and the federal constitution. Indeed, the legislative history of § 16-19e (a) (4) reveals that its drafters perceived the *Hope* decision as controlling with respect to the federal constitutional validity of rate orders. Conn. Joint Standing Committee Hearings, Regulated Activities, Pt. 2, 1975 Sess., p. 724. Neither the language of § 16-19e (a) (4) itself, nor its legislative history, however, indicates that the section was intended to establish an independent standard, apart from § 4-183 (g), for judicial review of DPUC rate orders. To the contrary, General Statutes

§ 16-35 expressly directs that judicial review of DPUC decisions be governed by § 4-183. Furthermore, in our interpretation of § 4-183, we are mindful of the "elementary rule of statutory construction that we must read the legislative scheme as a whole in order to give effect to and harmonize all of the parts." *Mitchell* v. *Mitchell,* 194 Conn. 312, 320, 481 A.2d 31 (1984); *Finkenstein* v. *Administrator,* 192 Conn. 104, 110, 470 A.2d 1196 (1984). If the specific provisions of that section are to be given their full effect, and the relationship between General Statutes §§ 16-35, 4-183 (g) and 16-19e (a) (4) harmonized, § 16-19e (a) (4) cannot, in the absence of an express legislative indication to the contrary, be read to allow what would in effect be a narrower standard of review than § 4-183 (g) establishes.

We conclude, therefore, that § 16-19e (a) (4) does not permit a court to sustain a rate order solely on the basis of a determination that the rate is "just and reasonable" and generally supported by record evidence. Similarly, § 16-19e (a) (4) does not express the sole standard for a reviewing court's determination of whether a regulated company's "substantial rights" have been prejudiced. Under the appropriate standard set out in § 4-183 (g), courts must undertake a case-by-case analysis to determine the merits of the challenged rate order and the prejudice, if any, to the regulated company. See, e.g., *Connecticut Natural Gas Corporation* v. *Public Utilities Control Authority,* supra, 139–40 (reliance on extra-record evidence for important facts demonstrates substantial prejudice); *Madow* v. *Muzio,* 176 Conn. 374, 382, 407 A.2d 997 (1978) (no substantial prejudice when, even after erroneously admitted evidence stricken from record, sufficient evidence remains to support agency conclusion); accord *Lawrence* v. *Kozlowski,* 171 Conn. 705, 714–15, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S. Ct. 2930, 53 L. Ed. 2d 1066 (1977).

Although the appropriate standard is that defined by § 4-183 (g), it bears emphasis that even that statute does not contemplate plenary judicial review of agency decisions. As we have often noted, a trial court's inquiry into the merits of an administrative agency decision, on the administrative record, is statutorily circumscribed. A court may not reverse or modify an agency decision unless it determines that an appellant's "substantial rights . . . have been prejudiced because the [agency's] findings, inferences, conclusions, or decisions" contravene any one of the section's six specific provisions. General Statutes § 4-183 (g). The court may not substitute its own judgment or discretion for that of the agency. *Leib* v. *Board of Examiners for Nursing,* 177 Conn. 78, 92, 411 A.2d 42 (1979); *Woodbury Water Co.* v. *Public Utilities Commission,* supra, 263; *Gulf Oil Corporation* v. *Board of Selectmen,* 144 Conn. 61, 65, 127 A.2d 48 (1956); *Conley* v. *Board of Education,* 143 Conn. 488, 498, 123 A.2d 747 (1956). In its review of administrative rate regulation, the court must, accordingly, ensure that the agency's decision-making process was conducted pursuant to the appropriate procedures and that the outcome of the process reflects reasoned decisionmaking—a reasonable application of relevant statutory provisions and standards to the substantial evidence on the administrative record. Section 4-183 (g), coupled with the presumption of validity that attends a DPUC rate order; *Woodbury Water Co.* v. *Public Utilities Commission,* supra, 260; establishes a standard for judicial review that is appropriately deferential to agency decisionmaking, yet goes beyond a mere judicial "rubber stamping" of an agency's decisions. See *Environmental Defense Fund, Inc.* v. *Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981).

There is room for incorporation of § 16-19e (a) (4) criteria within the frame of reference for judicial review established by § 4-183 (g). The latter section specifically

provides for the reversal or modification of an agency decision if, inter alia, it is contrary to a statutory provision. General Statues § 4-183 (g) (1). Thus, under § 4-183 (g) (1) a court must review a claim that a rate order violates § 16-19e (a) (4).[13] Even a rate order that complies with this statutory mandate, however, and establishes a rate of return "commensurate with returns on investments in other enterprises having corresponding risks"; *Federal Power Commission* v. *Hope Natural Gas Co.,* supra, 603; is not automatically entitled to judicial approval. While the court may not substitute its own balance of regulatory considerations for the balance undertaken by the agency, it must independently assure itself that the DPUC has given "reasoned consideration" to each of the guiding factors expressed in § 16-19e (a) (4). See *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968).

In this appeal, CL&P asserts that the rate order excluding $17.5 million from its rates pursuant to the DPUC's capacity sales analysis deprived it of its operating expenses under § 16-19e (a) (4). In elaborating upon this claim, however, CL&P argues that the exclusion can only be sustained if the DPUC was correct, as a legal and factual matter, in its finding that CL&P's capacity sales decision was not prudent. The gravamen, then, of CL&P's complaint is not that the DPUC's decision violates § 16-19e (a) (4), but rather that it reflects the application of an incorrect legal standard for deter-

---

[13] In order to facilitate judicial review, an appellant seeking review of a rate order on the ground that it violates General Statutes § 16-19e (a) (4) should do more than merely assert such a claim. The appellant should articulate, with particularity, how the rate order in question fails to comport with the specified factors in § 16-19e (a) (4). The appellant should also distinguish the claim that a rate order violates § 16-19e (a) (4) from other grounds on which the rate order is challenged, such as whether the order is supported by substantial evidence.

mining prudence and that it is unsupported by substantial evidence on the record. The trial court should have reviewed this claim under § 4-183 (g),[14] and its review of the rate order under the *Hope* test or its statutory equivalent in § 16-19e (a) (4) was, therefore, improper.

We would normally remand a case such as this one to the court with instructions to conduct a new review pursuant to the proper standard. Nonetheless, because the administrative record before us on appeal is identical to that which was before the trial court, the interests of judicial economy would not be served by a remand in this case. We therefore review CL&P's claims directly. We consider the substantial evidence issue first, and then examine the prudence standard issue.

### III

### A

Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. *Campisi* v. *Liquor Control Commission,* 175 Conn. 295, 296, 397 A.2d 1365 (1978); *Almada* v. *Administrator,* 137 Conn. 380, 391–92, 77 A.2d 765 (1951). "Substantial evidence" exists if the administrative record affords " ' "a substantial basis of fact from which the fact in

---

[14] We recognize that in its memorandum of decision, the court did find that the record supported the DPUC's decision as logical and rational. This may be an indication that the court concluded that the decision was neither arbitrary or capricious. See *Woodbury Water Co.* v. *Public Utilities Commission,* 174 Conn. 258, 263, 386 A.2d 232 (1978). In the absence of any elaboration upon the court's summary statement, however, we cannot determine whether the court properly conducted its review of the DPUC's decision pursuant to General Statutes § 4-183 (g).

issue can be reasonably inferred." ' " *Huck* v. *Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 541, 525 A.2d 940 (1987), quoting *Lawrence* v. *Kozlowski,* supra, 713; accord *Briggs* v. *State Employees Retirement Commission,* 210 Conn. 214, 217, 554 A.2d 292 (1989). "Such a standard of review allows less room for judicial scrutiny than does the 'weight of the evidence' rule or the 'clearly erroneous' rule." *Briggs* v. *State Employees Retirement Commission,* supra; see also *American Textile Manufacturers Institute, Inc.* v. *Donovan,* 452 U.S. 490, 523, 101 S. Ct. 2478, 69 L. Ed. 2d 185 (1981). In conducting its review, a court must defer to the agency's assessment of the credibility of the witnesses and to its right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part. *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 540–41.[15]

To support its conclusion that CL&P had engaged in imprudent sales of generating capacity, the DPUC made three crucial determinations: that a market existed for more expensive intermediate and baseload capacity; that CL&P should have sold such capacity instead of the short-term, peaking capacity that it actually sold; and that CL&P's sales evidenced a lack of good faith. Our review of the administrative record discloses substantial evidence to support these administrative findings.[16]

---

[15] Typically, following our review of an administrative record to determine whether substantial evidence exists to support an agency's decision, we would state only whether we had concluded that such evidence exists. Generally, in such decisions, the substantial evidence question is only one of numerous issues raised in an administrative appeal. Because the core of this case, however, is the substantial evidence issue, the discussion that follows is more elaborate than usual.

[16] The DPUC's written decision in this case clearly states the agency's conclusions with respect to the capacity sales analysis. The decision does not, however, contain any express findings of basic fact pertaining to that analysis. We, therefore, find it necessary to examine the record ourselves

The record establishes that due to high load growth and increased New England Power Pool (NEPOOL) reserve requirements,[17] other New England utilities were, for the first time in years, beginning to run short of capacity. NEPOOL estimates indicated that "all capacity in New England [was] . . . needed for reliability purposes." A March 3, 1987 NEPOOL operations committee report, recognizing that the Pilgrim I nuclear power plant in Massachusetts might be off-line, anticipated the likelihood of capacity deficiences ranging from 204 to 2334 megawatts (MW) for all but two weeks of the summer of 1987. NEPOOL also indicated that energy requirements in New England had increased nearly 20 percent over four years and that little energy assistance could be expected from neighboring utility services. Significantly, utility reserve requirements nationally were in the mid 20 percent range, while CL&P had a reserve margin of 45 to 50 percent, well beyond that which was necessary to meet its NEPOOL requirements.

The evidence also establishes that a market for capacity sales existed. Regional utilities such as Boston Edison, Central Maine Power, Commonwealth Electric, Public Service of New Hampshire and others needed to purchase capacity in order to satisfy their capability responsibility requirements. Boston Edison alone

to determine whether substantial evidence exists to support the basic facts from which the department could reasonably have drawn the conclusions that it did. To facilitate judicial review, agencies should include in their decisions an express statement of the factual findings on which their conclusions are based.

[17] In order to provide for unexpected demand or temporary loss of generating units, utilities are required to have generating capacity beyond their expected peak demand, the maximum demand experienced by a utility as a result of retail customer power requirements. This additional capacity is referred to as a reserve margin, or requirement. See *Madison Gas & Electric Co.* v. *Public Service Commission of Wisconsin,* 109 Wis. 2d 127, 131 nn.6–7, 325 N.W.2d 339 (1982).

had to replace 650 MW of capacity because Pilgrim I was inoperative at the time relevant to this case. CL&P's own expert witness testified that these conditions created a market for capacity sales. He further testified that CL&P could have sold at least 250 MW of capacity for close to $150 per kilowatt per year (kw-year). CL&P did not, however, extensively explore the market for capacity sales at such prices.

The evidence further establishes that during the years 1978 through 1986, CL&P had sold, on average, 125 MW of short-term capacity per year. In 1987, these sales increased dramatically. CL&P executed three capacity sales contracts on March 1, 1987, three on May 1, 1987, and six on November 1, 1987. As of March, 1987, CL&P had projected short-term sales of 625 MW for the summer of 1988. In July, 1987, CL&P revised this figure to 635 MW. As of November, 1987, CL&P had again revised that figure to 1173 MW. These capacity sales were made for an average price of $44/kw-year.

The DPUC concluded that CL&P had greatly increased its capacity sales in an effort to avoid an excess capacity charge of nearly $150/kw-year under § 16-19aa. CL&P does not contest the finding that its short-term sales greatly increased in 1987. It asserts, simply, that the coming on-line of Millstone III in 1986 "freed up" other capacity for sale. The DPUC counters, however, that while Millstone III may explain the existence of greater capacity, it does not explain, or justify, CL&P's decision to sell the amount and type of capacity that it actually sold. CL&P's large reserve margin of 45 to 50 percent, coupled with other utilities' need to purchase capacity to meet their reserve requirements, meant that CL&P had significant leverage to control the amount and type of capacity it could sell and the price it could receive for its capacity sales.

The DPUC accordingly concluded that CL&P had an available market for its long-term, more expensive intermediate and baseload capacity and that CL&P had acted imprudently in selling its short-term, inexpensive peaking capacity instead.

CL&P proffers three arguments to rebut the conclusion reached by the DPUC. It maintains that NEPOOL regulations, the Federal Energy Regulatory Commission (FERC) and managerial prudence dictated the nature of its capacity sales. We are unpersuaded by these arguments.

CL&P argues, first, that NEPOOL regulations created a "cap" upon the price that could be obtained for capacity and that it could not, therefore, have sold capacity at prices greater than it actually did. CL&P bases this argument in part on testimony given in 1989, nearly two years after the close of the administrative proceedings that led to this appeal and, therefore, not before the DPUC at the time it rendered its decision. CL&P also relies on the testimony of its own expert witness, which the DPUC was free to disregard. See *Huck* v. *Inland Wetlands & Watercourses Agency,* supra, 540–41.

CL&P's second argument invokes rules laid down by the FERC, which has jurisdiction over interstate capacity sales, that purportedly limit the price of such sales to the utility company's embedded cost, i.e., original cost less depreciation, or "net book cost," of the capacity sold. This limit, according to CL&P, prevented it from charging a greater price for the short-term, peaking capacity that it had sold. As the DPUC correctly observes, however, even if the FERC would have limited the price CL&P could have received for its capacity sales to the embedded cost of capacity sold, CL&P could have elected to sell Millstone III capacity, which has high embedded costs.

CL&P maintains, finally, that even if the record establishes its ability to have sold more expensive capacity, the record does not establish the prudence of such a course of action. CL&P claims that any decision to sell long-term, expensive capacity would have increased customer costs, forced it sooner to construct new generating capacity, and might possibly have left CL&P short of capacity in the mid-1990s. Consequently, CL&P argues, its decision not to sell long-term, expensive capacity was managerially prudent. The DPUC reasonably questions, however, whether, in the three to four month period during which CL&P greatly increased its capacity sales, a sale of long-term, expensive capacity would have caused the long-term problems that CL&P allegedly envisaged.

Because the DPUC, in evaluating the evidence before it, brought to bear its expertise, technical competence and specialized knowledge; General Statutes § 4-178; *Success Village Apartments, Inc.* v. *Local 376,* 175 Conn. 165, 170, 397 A.2d 85 (1978); its interpretation of the evidence must be sustained unless its conclusions are unreasonable. Administrative conclusions are not unreasonable simply because the evidence admits of multiple, possibly inconsistent, conclusions. See *National Labor Relations Board* v. *Nevada Consolidated Copper Corporation,* 316 U.S. 105, 106, 62 S. Ct. 960, 86 L. Ed. 1305 (1942). Having examined the record and found substantial evidence to support the basic facts from which the DPUC in this case could have drawn its conclusions, we conclude that its determinations of fact and law pass the test of reasonableness.

### B

General Statutes § 16-19e (a) (5)[18] requires the DPUC to ensure "that the level and structure of rates charged

---

[18] General Statutes § 16-19e (a) (5) provides: "In the exercise of its powers under the provisions of this title, the department of public utility control

customers shall reflect prudent and efficient management of the franchise operation." The prudence of a management decision depends on good faith and reasonableness, judged at the time the decision is made. *Violet* v. *Federal Energy Regulatory Commission,* 800 F.2d 280, 282–83 (1st Cir. 1986).

In the DPUC's capacity sales analysis, pursuant to which it made the determination of CL&P managerial imprudence, the DPUC did not charge CL&P with imprudence in building excess capacity, or in its decision to sell per se. Instead, the focus of the DPUC was on the "timing, the quantity and the price of the sales of capacity in question." The DPUC concluded that by its sudden increase in sales of inexpensive peaking capacity, CL&P sought to avoid the excess capacity adjustment under § 16-19aa and that, therefore, the sales decision was not made in good faith. Similarly, the DPUC concluded that a market for long-term, more expensive intermediate and baseload capacity existed at the time of CL&P's capacity sales, that CL&P management could or should have known of the existence of that market, and that CL&P acted unreasonably in failing to sell capacity to that market. On these findings of lack of good faith and unreasonableness, the DPUC charged CL&P with managerial imprudence.

CL&P argues that the DPUC's conclusion of imprudence cannot be sustained because the DPUC applied an incorrect standard when it determined that the capacity sales in question were imprudent. Since CL&P does not challenge the appropriateness of the prudence

shall examine and regulate the transfer of existing assets and franchises, the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles . . . (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation."

test of *Violet* v. *Federal Energy Regulatory Commission,* this issue resolves itself into an inquiry into the sufficiency of the administrative record to show lack of good faith or reasonableness. Because we concluded in our discussion in Part A, supra, that substantial evidence in the administrative record supports the DPUC's findings of lack of good faith and unreasonableness, we cannot say that its ultimate conclusion that CL&P's capacity sales reflected managerial imprudence is unjustified.

## C

In its capacity sales analysis, the DPUC adopted $89/kw, the replacement cost of peaking capacity,[19] as the standard for determining the $17.5 million exclusion for the unreasonably low compensation that CL&P received for its capacity sales. The DPUC multiplied the volume of CL&P's capacity sales during the relevant time period, less certain deductions, by the difference between the $89/kw standard and the average $44/kw that CL&P actually received for its sales of short-term, peaking capacity.

CL&P contests the $89/kw standard, arguing that it is unsupported by substantial evidence in the record. CL&P's argument misconstrues the method by which the DPUC adopted that standard. The DPUC does not maintain that CL&P could, or should, have sold all of its capacity for $89/kw. Instead, the standard represents the DPUC's attempt to establish a reasonable compensation standard for adjusting CL&P's rates once it had determined that CL&P had acted imprudently. The DPUC defends the reasonableness of the $89/kw standard, arguing that peaking capacity is the

---

[19] NEPOOL and CL&P agreed with the DPUC that $89/kw represented the replacement cost of peaking capacity. CL&P did not agree, however, that the $89/kw figure was the appropriate one to use in calculating the rate exclusion.

least expensive type of generating unit and CL&P could have sold mixes of units including intermediate and baseload capacity at prices that would have exceeded that standard.

Viewing the administrative record in its entirety, we are not persuaded that, in this particular case, the adoption of an $89/kw standard is unreasonable. We therefore hold that the DPUC's decision to exclude $17.5 million from CL&P's rates must be sustained.

The judgments are affirmed.

In this opinion the other justices concurred.