[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff Connecticut Light Power Company (CLP) appeals a decision of the defendant Department of Public Utility Control (DPUC) in its Docket No. 90-02-03. CT Page 10465 The DPUC's decision followed an investigation pursuant to General Statutes 16-8 and an extended hearing at which all parties participated and furnished evidence. In addition, the DPUC had a report from an independent expert, RCG/Hagler, Bailly, Inc. (RCG), that it had hired pursuant to General Statutes 16-8 (b)(3). The plaintiff appeals pursuant to General Statutes 4-183. The appeal is sustained in part and dismissed in part.
CLP is a public service company, as defined in General Statutes 16-1, that provides retail electric service to ratepayers in Connecticut. The DPUC is the state agency which is charged with the regulation and supervision of public service companies and the establishment of retail electric service rates, pursuant to chapter 277 of the general statutes. CLP purchases electric power at wholesale from the Connecticut Yankee Atomic Power Company (CYAPCO). Such wholesale transactions, including the wholesale rates, are regulated by the Federal Energy Regulatory Commission (FERC).
CLP owns a 34.5% interest in CYAPCO and is entitled to a proportionate share of its electrical power output. Pursuant to the wholesale electric power contract between the companies, CYAPCO charges CLP a proportionate share of CYAPCO's operational costs as part of the wholesale rate structure. FERC has formally approved this contract, including the rate structure.
In 1989, during a scheduled refueling shutdown of CYAPCO, the DPUC learned that the shutdown would be extended beyond its planned duration. The extension was needed to deal with the failure of the thermal shield, which had been repaired during a previous refueling shutdown in 1987/1988. CYAPCO had discovered that the previous repairs to the thermal shield had failed. In addition to damage caused by excessive wear and tear on various components of the shield, a large number of fuel rods had been damaged by debris which had been left in the reactor following the previous repairs.
As a result of these discoveries, CYAPCO decided to remove the thermal shield entirely.
The 1989/1990 refueling process, including the removal CT Page 10466 of the thermal shield, repair of the fuel rods, and removal of the debris left over from the previous repairs took three hundred forty-six days. An additional forty-four days was required to bring the plant back to 100% power. In the report it submitted to the DPUC, the consultant, RCG, found that 28.5 days of the total shutdown period were attributable to the debris clean-up. CLP disputes this finding, among others, claiming that only 16 days of the shutdown should be attributed to debris clean-up. In its final decision, which is the subject of this appeal, the DPUC adopts the finding of its consultant, 28.5 days.
In its decision, the DPUC found that CYAPCO had acted imprudently in its nuclear power plant operation in that CYAPCO failed to take reasonable steps to ensure that foreign materials were not left in the reactor vessel. Specifically, the DPUC found that the company's foreign materials exclusion procedure was deficient in that it required only one person to verify the removal of foreign objects. In this regard, the DPUC found that the company should have required that at least two people independently verify the removal of foreign objects. As evidence of this deficiency, a device known as an "annulus stuffer," which the company had placed in the reactor to serve as a debris barrier during the 1987/1988 shutdown, was discovered to have been inadvertently left in the reactor.
The DPUC further found that CYAPCO failed to take reasonable steps to remove debris generated by the 1987/1988 refueling and repair operation. Specifically, the DPUC found that CYAPCO should have undertaken additional underwater vacuuming, known as "swarping", in the reactor vessel.
The DPUC's findings that certain acts or, rather, omissions of CYAPCO were imprudent, led to the conclusions and orders that give rise to this appeal. As indicated above, pursuant to the wholesale contract, a proportionate share of CYAPCO's operating costs and expenses are passed on to CLP in the wholesale rate, ultimately to be paid by CLP's ratepayers. Such operating costs and expenses included, in this case, those incurred by CYAPCO for the debris clean-up and removal. As a result of CLP's ownership interest in CYAPCO, the DPUC also concluded that any imprudence on the part of CYAPCO management is CT Page 10467 imputable to the full extent to CLP. CLP does not dispute that it is fully accountable for CYAPCO's imprudence. The DPUC further concluded, however, that it has the power to order that the costs associated with such imprudence not be borne by CLP's ratepayers. The DPUC found that the costs and expenses of the 1989/1990 cleanup operation which were attributable to CYAPCO's imprudence amounted to $230,000, and it ordered that that amount be deducted from the total cleanup costs which the companies sought to charge to CLP's ratepayers. CLP does dispute this order.
A significant additional expense incurred by CLP as result of the shutdown of the nuclear power plant was the cost of replacement power it had to purchase and supply to its ratepayers during the shutdown. The total cost of this replacement power for the entire shutdown period was $39,953,000. of that sum, $3,003,000 was incurred during the 28.5 days of shutdown that the DPUC found was caused by CYAPCO's imprudence. Accordingly, the DPUC ordered that that amount be deducted from the total cost of replacement power to be paid by the ratepayers.
During the 1989/1990 shutdown, CLP was insured against the cost of extended shutdowns, collectible after a twenty-one week deductible period. CLP collected $6,300,000 on this insurance for the shutdown. The DPUC found that the evidence did not establish that the insurance was payable solely as a result of the 28.5 day shutdown period which was related to CYAPCO's imprudence. Even if the 28.5 day period was the sole insurance triggering event, however, the DPUC concluded that the proceeds could not be applied to reduce or erase the costs associated with that period. To do so, the DPUC reasoned, would have the effect of charging the ratepayers for the imprudence of the utility companies. In this regard, the DPUC noted that the ratepayers were being charged approximately $25,000,000 even without the costs associated with the "imprudence period". In order to give full benefit of the insurance to the ratepayers, the DPUC ordered that the proceeds be applied first to the costs of the shutdown that are not associated with the utilities' imprudence. This, of course, would totally exhaust the proceeds.
CLP raises three issues as the bases of its appeal of the DPUC's orders. They may be summarized as follows: CT Page 10468
 1. The order disallowing CLP's recovery from its ratepayers of $230,000 of costs charged by CYAPCO violates the supremacy clause of the United States constitution and is preempted by federal law.
 2. The DPUC erroneously found that CYAPCO's acts and/or omissions following the 1987/1988 refueling operation were imprudent. The order that CLP not collect or refund to its ratepayers $3,003,000 of power replacement costs, which was based on the finding of imprudence, was therefore, in error.
 3. The DPUC erroneously failed to offset the $3,003,000 power replacement cost by the full $6,300,000 received by CLP from its insurer.
Pursuant to General Statutes 16-35, appeals from decisions of the DPUC are subject to the provisions of General Statutes 4-183. Subsection (f) of the latter statute provides as follows:
 (f) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) in violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
CT Page 10469
The relevant statutory guidelines imposed on the DPUC in its utility rate control function are set forth in General Statutes 16-19e(a)(5), which reads as follows:
 (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation. . . .
Our Supreme Court set forth the proper standard of review in appeals from rate orders of the DPUC in Connecticut Light Power Co. v. DPUC, 219 Conn. 51, 55-58
(1991). Relying on its previous decision in another case between these parties, Connecticut Light Power Co. v. DPUC, 216 Conn. 627 (1990) [cited in the following excerpts as "CLP v. DPUC"], the court explained:
 In reviewing administrative rate decision, the court must, therefore, "ensure that the agency's decisionmaking process was conducted pursuant to the appropriate procedures and that the outcome of the process reflects reasoned decisionmaking — a reasonable application of relevant statutory provisions and standards to the substantial evidence on the administrative record. Section 4-183(f) coupled with the presumption of validity that attends a DPUC rate order establishes a standard for judicial review that is appropriately deferential to agency decisionmaking, yet goes beyond a mere judicial `rubber stamping' of an agency's decisions." CLP v. DPUC, supra, 637. "Substantial evidence" exists if the administrative record demonstrates "`a substantial basis of fact from which the fact in issue can be reasonably inferred. . . "With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency.' . . . `Judicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether in light of the evidence, CT Page 10470 the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . In the specialized context of a rate case, the court may not substitute its own balance of the regulatory considerations for that of the agency, and must assure itself that the DPUC has given reasoned consideration to the factors expressed in 16-19e(a)(4).
The court will consider the plaintiff's claims separately, in the light of the above principles and applicable federal law.
I. Disallowance of $230,000 Clean-Up Costs
CLP contends, and it is not disputed, that the costs of clean-up, incurred as part of the nuclear reactor refueling operation, are properly designated as operating costs of CYAPCO. As such, these costs are a component of the wholesale rate charged by CYAPCO to its customer, CLP, under the wholesale contract approved by FERC. Since FERC has exclusive jurisdiction to approve such contracts, including the rate structure provided therein, CLP argues that DPUC had no power to alter the rate charged by CYAPCO, including the $230,000 portion of its clean-up operating costs. CLP argues further that federal law and regulations do not allow the DPUC to prevent CLP from passing on to its customers, the ratepayers, the full amount of the wholesale rate it pays CYAPCO, including in this case the disputed $230,000.
In support of its appeal of the DPUC's order with respect to the clean-up costs, CLP cites Mississippi Power a Light Co. v. Mississippi Ex Rel. Moore, 487 U.S. 354
(1987). That decision of the United States Supreme Court fully supports CLP's position and is dispositive of its appeal on this issue.
In the Mississippi Power Light case, supra, the Supreme Court reiterated its prior holding that FERC has exclusive authority to approve wholesale electric power rates and that its determinations in this regard are binding on state courts and regulatory agencies under the Supremacy Clause of the United States Constitution. Id., 371. The Supreme Court further held that a state may CT Page 10471 not bar a regulated utility from passing through to its retail customers the FERC approved wholesale rate. "When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate." Id., 372, quoting Nantahala Power Light Co. v. Thornburg, 476 U.S. 953 (1986).
The Supreme Court held that the general principle of FERC supremacy in the field of wholesale utility rate approval prohibited the Mississippi state regulatory agency from inquiring into the prudence of the management decisions that led to the construction of the nuclear power plant which supplied the wholesale electric power. The purpose of the inquiry would have been to allow the state agency to bar the retail seller from recovering the FERC-approved wholesale rate from the retail consumers if the agency found that the management decisions had been imprudent.
The general principles of the Mississippi Power Light case govern the court's decision in this case. The DPUC seeks to bar CLP from recovering the FERC-approved wholesale rate from its retail customers on the ground that management decisions and actions which were factors in the creation of that rate were imprudent. It is immaterial that the nature of the management decisions in this case were operational — i.e. the decisions concerning swarping and verification of foreign object removal — whereas the nature of the management decisions in the Mississippi Power Light case were economic and fiscal. The point is that FERC has exclusive jurisdiction in this area, and the DPUC may not override its decisions. This does not mean, of course, as CLP points out, that the DPUC and its ratepayers have no means of contesting the imposition of rates which are inflated as a result of CYAPCO's alleged mismanagement. The DPUC and the defendant Office of Consumer Counsel, representing the retail ratepayers, may appeal to FERC for relief and thereafter to the courts for a review of FERC's action. But the DPUC does not have the authority unilaterally to reduce the retail rates based on its own prudence review of the wholesaler's management decisions.
The DPUC, in its decision and in its appeal to this CT Page 10472 court, relies on the decision of the United States Court of Appeals in New Orleans Public Service, Inc. v. Council of the City of New Orleans, 911 F.2d 993 (1990); cert. dismissed 112 S.Ct. 411; as the basis of its power to issue the disputed order. The court has reviewed that case and concludes that it is not controlling in this case. In the NOPSI case, the issue was whether the local regulatory agency was preempted from inquiring into the prudence of the retail-seller's decision not to diversify its sources of wholesale electric power supply. The court based its decision that the agency was not "facially" preempted on the finding that
 . . . The (agency) has not sought directly to regulate interstate wholesale rates; nor has it questioned the validity of the FERC-prescribed allocation of power within the Grand Gulf system, or the FERC-prescribed wholesale rates; nor has it reexamined the prudence of NOPSI's agreement to participate in Grand Gulf 1 in the first place. . . .
Id., 998.
The court agrees with CLP that the NOPSI decision creates only a limited exception to the general rule set forth in the Mississippi Power Light and Nantahala cases, supra. In the NOPSI case, the retail seller was in a position to make a judgment whether it should even sell to its ratepayers the electric power which came to it with the disputed rate. Thus, the prudence/imprudence inquiry in that case focused not on decisions which led to the creation of the wholesale rate, which had been approved by FERC, but rather on a decision subsequently made by the retail seller which was not subject to FERC oversight. It was that decision which the local regulatory agency sought to review and which the court found to be not "facially" preempted. New Orleans Public Service Inc. v. Council of New Orleans, supra, 998.
In the case before this court, by contrast, CLP has no option but to purchase the electric power from CYAPCO and sell it to the retail customers. The decisions which the regulatory agency here seeks to review are, therefore, of an entirely different nature than those at issue in the NOPSI case. Here, the decisions are operational decisions CT Page 10473 which allegedly were causative factors in formulating the rates. Thus, the DPUC's inquiry and its finding of imprudence essentially question the validity of those rates. And that action by the DPUC is explicitly not authorized by the NOPSI case. Id.
The court's analysis of the DPUC's order, as set forth above, leads to the conclusion that the order violates the Supremacy Clause of the United States constitution in accordance with the rule of the Mississippi Power Light and Nantahala cases, supra. For that reason, the order may not be affirmed, General Statutes 4-183(f)(1). The appeal of CLP is, therefore, sustained with respect to the DPUC's order disallowing the $230,000 rate charge.
II. Finding of Imprudence
In its brief, CLP does not dispute the DPUC's power under federal and state law to review the prudence of CYAPCO's management decisions in order to control the costs of the replacement power which it was required to purchase from other sources and then charged to the ratepayers. Rather, CLP challenges the DPUC's findings that CYAPCO's imprudence extended the length of the 1989/1990 shutdown and thereby caused the cost of the replacement power to be increased.
In support of its claims on this issue, CLP contends that the DPUC utilized the wrong standard of proof in making its finding of imprudence and erroneously determined the amount of "damages" proximately caused by the alleged imprudence.
The administrative record in this case is extensive. All parties fully participated in the fact-finding process. The DPUC held a hearing over a three day period. Written interrogatories were filed. In addition, as noted, the DPUC retained an independent consultant, which filed a written report as part of the record.
The disputed factual findings concerning the alleged imprudence are set forth earlier in this memorandum. With respect to its claim that the DPUC used the wrong standard of proof, CLP cites Connecticut Light Power Co. v. DPUC,216 Conn. 627 (1990), holding that "(t)he prudence of a CT Page 10474 management decision depends on good faith and reasonableness, judged at the time the decision is made." Id., 645. CLP argues that the preventive and clean-up decisions made at the time of the 1987/1988 shutdown were reasonable in the light of conditions known at that time. Therefore, it contends, those decisions should not later be held to be imprudent solely because the results — i.e. debris left in the reactor causing damage, are unfavorable.
General Statutes 16-22 provides "(a)t any hearing involving a rate . . . of a public service company, the burden of proving that said rate under consideration is just and reasonable . . . shall be on the public service company." In its brief, CLP emphasizes the efforts it made during the 1987/1988 shutdown to prevent the accumulation of debris in the reactor and to ensure the removal of any such debris. These efforts are well documented in the record and are essentially not disputed. The DPUC's consultant, RCG, while acknowledging those efforts, nevertheless made the critical factual finding that the most likely source of the debris was that it came from the floor of the refueling cavity during the process of replacing "reactor internals." Although RCG indicated it had "significant reservations" about that theory, it pointed out in its report that the theory had the support of Northeast Utilities Service Company, an affiliate of CLP and CYAPCO, following that company's investigation. In its report, RCG ultimately adopted that theory as the "most plausible" explanation of the presence of the debris.
Having identified the source of the debris as the floor of the refueling cavity, RCG concluded that CYAPCO was negligent in failing "to fully clean the entire refueling cavity prior to the partial drain down." RCG characterized this failure as a "critical process fault." See Record III — 6, 2-34.
As indicated, there is little, if any, serious dispute regarding the presence of debris in the reactor and the damage it caused. The dispute in the case is whether there is substantial evidence in the record to support the DPUC's findings and conclusions that CYAPCO's actions to prevent the accumulation of the debris and to remove it were insufficient — that is, imprudent. The principal evidence CT Page 10475 on which the DPUC relied, as stated in its decision, is the report submitted by its consultant, RCG. The DPUC also relied on its own expertise in evaluating the evidence, including but not limited to the RCG report. See, in particular, the concurring opinion of Commissioner Thomas M. Benedict.
When the DPUC, in evaluating the evidence, brings to bear its expertise, technical competence, and specialized knowledge, "its interpretation of the evidence must be sustained unless its conclusions are unreasonable. Administrative conclusions are not unreasonable simply because the evidence admits of multiple, possibly inconsistent, conclusions." CLP v. DPUC, supra, 644. In this case, the DPUC sifted through reams of evidence, including the lengthy report of its independent consultant. The court has likewise examined the evidence, in particular the report of RCG. There is, as indicated, substantial evidence to support the DPUC's ultimate findings and conclusions, notwithstanding that there is also extensive conflicting evidence. That being so, the court must affirm the DPUC's decision on those issues. In summary, the DPUC did not hold the utility companies to a standard of strict liability, but rather concluded that CYAPCO was guilty of specific acts or omissions of imprudence that caused damage and prolonged the plant shutdown.
Plaintiff CLP also challenges the DPUC's decision that the proceeds of the shutdown insurance must be applied to the cost of the entire extended shutdown period rather than only to the cost of the limited period related to CYAPCO's imprudence. The DPUC points out in its decision, however, that the premiums for this insurance were paid by the ratepayers and that they are entitled to receive the maximum possible benefit from it. Once a covered event triggers the payment of proceeds under the policy, the DPUC reasoned, the proceeds should be applied first to reduce the rate otherwise payable by the ratepayers. In so holding, the DPUC rejected the argument of CLP that the insurance proceeds should be applied to reduce the costs associated with CYAPCO's imprudence because those costs are not to be borne by the ratepayers. The court finds that the decision of the DPUC on this issue is entirely reasonable.
The final basis for its appeal is CLP's assertion CT Page 10476 that the additional swarping of the fuel cavity which the DPUC suggested should have been done would have incurred its own additional cost. CLP argues that it was error for the DPUC not to have taken this additional cost into consideration as an offset against the amount of the replacement cost it disallowed. The flaw in this argument, as the DPUC points out in its brief, is that the evidence in the record is insufficient to establish the cost of the additional swarping, the amount of time it would have taken, or the cost of the replacement fuel associated with the additional time needed for the additional swarping. The CLP's appeal may not be sustained on this basis.
To summarize, the appeal of the plaintiff CLP is sustained with respect to the DPUC's order barring the CLP from passing on to its ratepayers the costs of the clean-up which were included in the wholesale rate charged by CYAPCO; the appeal is dismissed with respect to the DPUC's order barring the CLP from passing on to its ratepayers the cost of replacement power purchased for the 28.5 day period of shutdown found to have been caused by CYAPCO's imprudence.
Assistant Attorney General Kohler for plaintiff.
Robert P. Wax for defendant.