GENERAL MOTORS CORPORATION *v.*
EUGENE DOHMANN
(SC 15935)

Callahan, C. J., and Borden, Berdon, Norcott and Katz, Js.

Argued September 22—officially released December 22, 1998

*Albert A. Zakarian,* pro hac vice, for the appellant (plaintiff).

*Garry Desjardins,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Steven M. Rutstein,* assistant attorney general, for the appellee (intervening defendant).

*Opinion*

CALLAHAN, C. J. The sole issue in this appeal is whether the Connecticut "lemon law," General Statutes §§ 42-179 through 42-186,[1] requires the plaintiff, General Motors Corporation, to provide the defendant, Eugene Dohmann, with a replacement vehicle.

The arbitration panel to which the matter had been referred subsequent to the defendant having instituted an arbitration proceeding pursuant to General Statutes § 42-181 reasonably could have found the following facts. On October 26, 1996, the defendant purchased a new Chevrolet S-10 pickup truck (truck) from Maritime Motors (Maritime),[2] a General Motors dealership located in South Norwalk. The following day, the defendant noticed defects in the paint on the truck's hood, roof and bumpers. The defendant promptly notified Maritime of the defects and requested that the dealership provide him with a replacement vehicle pursuant

---

[1] Unless otherwise indicated, all references herein to General Statutes §§ 42-179 through 42-186 are to the General Statutes as revised to 1995.

[2] Maritime is not a party to this action.

to General Statutes § 42-179.[3] Maritime agreed to inspect the truck for defects, but refused the defendant's request for a replacement vehicle.

[3] General Statutes § 42-179 provides: "(a) As used in this chapter: (1) 'Consumer' means the purchaser, other than for purposes of resale, of a motor vehicle, a lessee of a motor vehicle, any person to whom such motor vehicle is transferred during the duration of an express warranty applicable to such motor vehicle, and any person entitled by the terms of such warranty to enforce the obligations of the warranty; and (2) 'motor vehicle' means a passenger motor vehicle or a passenger and commercial motor vehicle, as defined in section 14-1, which is sold or leased in this state.

"(b) If a new motor vehicle does not conform to all applicable express warranties, and the consumer reports the nonconformity to the manufacturer, its agent or its authorized dealer during the period of two years following the date of original delivery of the motor vehicle to a consumer or during the period of the first eighteen thousand miles of operation, whichever period ends first, the manufacturer, its agent or its authorized dealer shall make such repairs as are necessary to conform the vehicle to such express warranties, notwithstanding the fact that such repairs are made after the expiration of the applicable period.

"(c) No consumer shall be required to notify the manufacturer of a claim under this section and sections 42-181 to 42-184, inclusive, unless the manufacturer has clearly and conspicuously disclosed to the consumer, in the warranty or owner's manual, that written notification of the nonconformity is required before the consumer may be eligible for a refund or replacement of the vehicle. The manufacturer shall include with the warranty or owner's manual the name and address to which the consumer shall send such written notification.

"(d) If the manufacturer, or its agents or authorized dealers are unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use, safety or value of the motor vehicle to the consumer after a reasonable number of attempts, the manufacturer shall replace the motor vehicle with a new motor vehicle acceptable to the consumer, or accept return of the vehicle from the consumer and refund to the consumer, lessor and lienholder, if any, as their interests may appear, the following: (1) The full contract price, including but not limited to, charges for undercoating, dealer preparation and transportation and installed options, (2) all collateral charges, including but not limited to, sales tax, license and registration fees, and similar government charges, (3) all finance charges incurred by the consumer after he first reports the nonconformity to the manufacturer, agent or dealer and during any subsequent period when the vehicle is out of service by reason of repair, and (4) all incidental damages as defined in section 42a-2-715, less a reasonable allowance for the consumer's use of the vehicle. No authorized dealer shall be held liable by the manufacturer for any refunds or vehicle replacements in the absence of evidence indicating

that dealership repairs have been carried out in a manner inconsistent with the manufacturers' instructions. Refunds or replacements shall be made to the consumer, lessor and lienholder if any, as their interests may appear. A reasonable allowance for use shall be that amount obtained by multiplying the total contract price of the vehicle by a fraction having as its denominator one hundred thousand and having as its numerator the number of miles that the vehicle traveled prior to the manufacturer's acceptance of its return. It shall be an affirmative defense to any claim under this section (1) that an alleged nonconformity does not substantially impair such use, safety or value or (2) that a nonconformity is the result of abuse, neglect or unauthorized modifications or alterations of a motor vehicle by a consumer.

"(e) It shall be presumed that a reasonable number of attempts have been undertaken to conform a motor vehicle to the applicable express warranties, if (1) the same nonconformity has been subject to repair four or more times by the manufacturer or its agents or authorized dealers during the period of two years following the date of original delivery of the motor vehicle to a consumer or during the period of the first eighteen thousand miles of operation, whichever period ends first, but such nonconformity continues to exist or (2) the vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days during the applicable period, determined pursuant to subdivision (1) of this subsection. Such two-year period and such thirty-day period shall be extended by any period of time during which repair services are not available to the consumer because of a war, invasion, strike or fire, flood or other natural disaster. No claim shall be made under this section unless at least one attempt to repair a nonconformity has been made by the manufacturer or its agent or an authorized dealer or unless such manufacturer, its agent or an authorized dealer has refused to attempt to repair such nonconformity.

"(f) If a motor vehicle has a nonconformity which results in a condition which is likely to cause death or serious bodily injury if the vehicle is driven, it shall be presumed that a reasonable number of attempts have been undertaken to conform such vehicle to the applicable express warranties if the nonconformity has been subject to repair at least twice by the manufacturer or its agents or authorized dealers within the express warranty term or during the period of one year following the date of the original delivery of the motor vehicle to a consumer, whichever period ends first, but such nonconformity continues to exist. The term of an express warranty and such one-year period shall be extended by any period of time during which repair services are not available to the consumer because of war, invasion, strike or fire, flood or other natural disaster.

"(g) (1) No motor vehicle which is returned to any person pursuant to any provision of this chapter or in settlement of any dispute related to any complaint made under the provisions of this chapter and which requires replacement or refund shall be resold, transferred or leased in the state without clear and conspicuous written disclosure of the fact that such motor vehicle was so returned prior to resale or lease. Such disclosure shall be affixed to the motor vehicle and shall be included in any contract for sale

After inspecting the truck, Maritime agreed that the truck's paint was defective, but again refused to provide

or lease. The commissioner of motor vehicles shall, by regulations adopted in accordance with the provisions of chapter 54, prescribe the form and content of any such disclosure statement and establish provisions by which the commissioner may remove such written disclosure after such time as the commissioner may determine that such motor vehicle is no longer defective. (2) If a manufacturer accepts the return of a motor vehicle or compensates any person who accepts the return of a motor vehicle pursuant to subdivision (1) of this subsection such manufacturer shall stamp the words 'MANUFACTURER BUYBACK' clearly and conspicuously on the face of the original title in letters at least one-quarter inch high and, within ten days of receipt of the title, shall submit a copy of the stamped title to the department of motor vehicles. The department of motor vehicles shall maintain a listing of such buyback vehicles and in the case of any request for a title for a buyback vehicle, shall cause the words 'MANUFACTURER BUYBACK' to appear clearly and conspicuously on the face of the new title in letters which are at least one-quarter inch high. Any person who applies for a title shall disclose to the department the façt that such vehicle was returned as set forth in this subsection. (3) If a manufacturer accepts the return of a motor vehicle from a consumer due to a nonconformity or defect, in exchange for a refund or a replacement vehicle, whether as a result of an administrative or judicial determination, an arbitration proceeding or a voluntary settlement, the manufacturer shall notify the department of motor vehicles and shall provide the department with all relevant information, including the year, make, model, vehicle identification number and prior title number of the vehicle. The commissioner of motor vehicles shall adopt regulations in accordance with chapter 54 specifying the format and time period in which such information shall be provided and the nature of any additional information which the commissioner may require. (4) The provisions of this subsection shall apply to motor vehicles originally returned in another state from a consumer due to a nonconformity or defect in exchange for a refund or replacement vehicle and which a lessor or transferor with actual knowledge subsequently sells, transfers or leases in this state.

"(h) All express and implied warranties arising from the sale of a new motor vehicle shall be subject to the provisions of part 3 of article 2 of title 42a.

"(i) Nothing in this section shall in any way limit the rights or remedies which are otherwise available to a consumer under any other law.

"(j) If a manufacturer has established an informal dispute settlement procedure which is certified by the attorney general as complying in all respects with the provisions of Title 16 Code of Federal Regulations Part 703, as in effect on October 1, 1982, and with the provisions of subsection (b) of·section 42-182, the provisions of subsection (d) of this section concerning refunds or replacement shall not apply to any consumer who has not first resorted to such procedure."

a different vehicle. Instead, the dealership offered to replace the truck's hood, the part of the truck on which the paint defects were most visible, with a hood taken from another vehicle of the same color. The defendant allowed Maritime to undertake that repair attempt. The replacement hood, however, did not fit properly and the paint was not an exact match. Dissatisfied with the repair attempt, the defendant told Maritime to reinstall the original hood, and Maritime complied.

Maritime subsequently suggested two other possible methods of curing the defects in the paint: (1) wet sanding and (2) repainting the affected areas of the truck. The defendant, however, rejected these suggestions because he believed that both wet sanding and repainting would remove the truck's original factory finish. In the defendant's view, the factory process produces a paint finish superior to that of a body shop. As a result, he informed Maritime that he would not accept any repairs that would remove or alter the factory finish of the truck. Because both of the suggested repairs involved processes that would alter the truck's original factory finish, the defendant refused to authorize additional repair attempts.

Thereafter, the defendant initiated an arbitration proceeding against the plaintiff pursuant to § 42-181.[4] After a hearing, a three member arbitration panel determined that: (1) the truck had been subject to a reasonable number of unsuccessful repair attempts, and (2) the defective paint substantially impaired the truck's value

[4] General Statutes § 42-181 provides in relevant part: "(a) The department of consumer protection, shall provide an independent arbitration procedure for the settlement of disputes between consumers and manufacturers of motor vehicles which do not conform to all applicable warranties under the terms of section 42-179. . . .

"(b) If any motor vehicle purchased at any time on or after October 1, 1984, or leased at any time on or after June 17, 1987, fails to conform to such applicable warranties as defined in said section 42-179, a consumer may bring a grievance to an arbitration panel . . . ."

to the defendant. See General Statutes § 42-179 (d) and (e). Consequently, the panel concluded that, under § 42-179, the defendant was entitled to a new, comparably equipped replacement vehicle.

The plaintiff filed a timely application in the Superior Court to vacate the arbitration award. See General Statutes § 52-418.[5] The Connecticut department of consumer protection subsequently was granted leave to intervene as a party defendant pursuant to Practice Book § 99, now § 9-18, and General Statutes § 52-107. The trial court agreed with the arbitration panel and, therefore, denied the plaintiff's application to vacate the arbitration award. The plaintiff appealed from the decision of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, the plaintiff claims that the trial court improperly affirmed the decision of the arbitration panel. Specifically, the plaintiff maintains that the record does not contain substantial evidence to support the arbitrators' findings that: (1) the truck had been subject to a reasonable number of repair attempts, and (2) the defects in the paint substantially impaired the value of the truck to the defendant. See General Statutes § 42-179 (d) and (e).

---

[5] General Statutes § 52-418 provides in relevant part: "Vacating award. (a) Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or, in a controversy concerning land, for the judicial district in which the land is situated or, when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. . . ."

## I

Our analysis begins with a brief overview of Connecticut's lemon law legislation. "In 1982, the Connecticut legislature enacted Public Acts 1982, No. 82-287 (Lemon Law I). That act is codified as General Statutes § 42-179. For consumer buyers of new motor vehicles, the act provides supplemental remedies of repair, replacement and refund to facilitate the enforcement of express warranties made by the manufacturers of such vehicles. These supplemental remedies come into play whenever a manufacturer or authorized dealer, after a reasonable number of repair attempts, is unable substantially to conform a new vehicle to the terms of the express warranty. . . .

"In 1984, the legislature enacted Public Acts 1984, No. 84-338 (Lemon Law II), now codified as General Statutes §§ 42-181 through 42-184. The purpose of Lemon Law II is to provide, for consumer purchasers of new motor vehicles, an alternative to civil litigation. The key provision is § 42-181, which authorizes the department of consumer protection to establish 'an independent arbitration procedure for the settlement of disputes between consumers and manufacturers of motor vehicles which do not conform to all applicable warranties under the terms of section 42-179.' " *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 70–71, 523 A.2d 486 (1987).

As a threshold matter, we note that judicial review of lemon law arbitration awards is governed by § 42-181 (c) (4), which provides in relevant part: "The court shall conduct a de novo review of the questions of law raised in the application. . . . In reviewing questions of fact, the court shall uphold the award unless it determines that the factual findings of the arbitrators are not supported by substantial evidence in the record . . . ." Pursuant to this test, a reviewing court must

determine whether there is substantial evidence in the record to support the arbitrators' findings of fact and whether the conclusions drawn from those facts are reasonable.[6] *Connecticut Light & Power Co. v. Dept. of Public Utility Control*, 216 Conn. 627, 639, 583 A.2d 906 (1990). Moreover, "[i]n determining whether an [arbitration panel's] finding is supported by substantial evidence, a court must defer . . . to the [arbitration panel's] right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part." (Internal quotation marks omitted.) *Chmielewski v. Aetna Casualty & Surety Co.*, 218 Conn. 646, 660–61 n.15, 591 A.2d 101 (1991); *Connecticut Light & Power Co. v. Dept. of Public Utility Control*, supra, 640. "This limited standard of review dictates that, [w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the [arbitration panel]." (Internal quotation marks omitted.) *New England Cable Television Assn., Inc. v. Dept. of Public Utility Control*, 247 Conn. 95, 117–18, 717 A.2d 1276 (1998); *Connecticut Light & Power Co. v. Dept. of Public Utility Control*, 219 Conn. 51, 57, 591 A.2d 1231 (1991). With these principles in mind, we address the merits of the plaintiff's arguments.

## II

The plaintiff first claims that the record does not contain substantial evidence to support the arbitrators'

---

[6] In *Motor Vehicle Manufacturers Assn. of the United States, Inc. v. O'Neill*, 212 Conn. 83, 96–97, 561 A.2d 917 (1989), we concluded that the substantial evidence test that governs judicial review of the factual findings of an administrative agency pursuant to the Uniform Administrative Procedure Act; General Statutes § 4-166 et seq.; did not govern judicial review of the factual findings of an arbitration panel pursuant to General Statutes (Rev. to 1989) § 42-181. In 1990, however, the legislature amended § 42-181 to provide that the administrative standard governs judicial review of factual findings of lemon law arbitration panels. See Public Acts 1990, No. 90-8, § 1; see also 33 H.R. Proc., Pt. 4, 1990 Sess., p. 1065.

finding that the defendant's truck had been subjected to a reasonable number of unsuccessful attempts to repair its paint. Specifically, the plaintiff maintains that, because the additional repairs suggested by the dealership were capable of producing a paint finish that met factory standards,[7] the single attempt[8] to cure the defect by replacing the truck's hood was insufficient to constitute the requisite reasonable number of repair attempts. See General Statutes § 42-179 (e). We disagree.

Section 42-179 provides in relevant part: "(d) If the manufacturer, or its agents or authorized dealers are unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use, safety or value of the motor vehicle to the consumer *after a reasonable number of [repair] attempts*, the manufacturer shall replace the motor vehicle with a new motor vehicle acceptable to the consumer . . . . (e) It shall be presumed that a reasonable number of [repair] attempts have been undertaken . . . if . . . the same nonconformity has been subject to repair four or more times . . . . No claim shall be made under this section unless at least one attempt to repair a nonconformity has been made . . . ." (Emphasis added.)

When the lemon law was enacted in 1982, the precursor to § 42-179 (e) did not include the requirement that "[n]o claim shall be made under this section unless at least one attempt to repair a nonconformity has been made . . . ." See General Statutes (Rev. to 1983) § 42-179 (d). The legislature added that language in 1989, in

---

[7] The defendant appears to concede that, in this case, the factory paint specifications would satisfy the manufacturer's express warranty specifications as required by § 42-179.

[8] At oral argument before this court, the plaintiff conceded that the arbitrators reasonably could have determined that the attempted replacement of the truck's hood constituted the single repair attempt required by § 42-179 (e). As a result, it is undisputed that the defendant met the statutory prerequisite of a single repair attempt for instituting an arbitration proceeding.

response to a report of the legislative program review and investigations committee. See Public Acts 1989, No. 89-173; see also General Statutes (Rev. to 1991) § 42-179 (e).[9] We previously have concluded that reports from blue ribbon commissions and legislative committees, such as the legislative program review and investigations committee, are instructive of legislative intent. See *Ensign-Bickford Realty Corp.* v. *Zoning Commission*, 245 Conn. 257, 272–73, 715 A.2d 701 (1998); *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 196, 708 A.2d 1371 (1998). Specifically, the legislative program and review committee's report read in relevant part: "[G]enerally a reasonable number of repair attempts is defined as four attempts during the first 18,000 miles or two years and the problem continues to exist . . . . In some instances, less than four repair attempts is allowed if the problem is one for which evidence exists that no repair will bring the vehicle back into conformance." Legislative Program Review and Investigations Committee, Performance Audit of the Connecticut Lemon Law (1989), p. 20. The report further states: "[I]n cases involving problems with the paint on a vehicle, a determination may be made that it is impossible for any dealer to repaint the vehicle in a manner that would match the type of finish originally achieved at the manufacturer's plant when the car was built." Id., p. 21. Consequently, if the record contains substantial evidence to support a finding that proposed additional repair attempts would not have produced a paint finish that satisfied factory paint specifications, arbitrators reasonably may find that a single repair attempt is sufficient under § 42-179 (e).

---

[9] The bill that ultimately amended § 42-179 (e) to provide that at least one repair attempt must be made before a consumer may initiate a lemon law arbitration proceeding was entitled "An Act Implementing Recommendations of the Legislative Program Review and Investigations Committee Concerning the New Automobile Warranties Program." See Public Acts 1989, No. 89-173; Conn. Joint Standing Committee Hearings, Program Review, Pt. 1, 1989 Sess., p. 9.

The record before us reveals the following regarding the utility of additional repair attempts. The plaintiff presented affidavits of two automobile body experts who stated that body shop paint processes are capable of producing results equal to, and in some cases superior to, those produced by the original factory paint process. The state's technical expert, Gregory Carver, however, testified that the conditions under which the factory originally paints a vehicle are superior to those that exist in a body shop. Specifically, Carver stated that paint bonds to the surface of a vehicle most successfully the first time it is applied, and that, therefore, it is impossible for a body shop to duplicate the bond achieved at the factory. Carver further stated that the finish of a repainted vehicle is less durable than the finish applied at the factory.

The arbitration panel acted within its discretion as a fact finder by crediting Carver's testimony over that of the plaintiff. *Chmielewski* v. *Aetna Casualty & Surety Co.*, supra, 218 Conn. 660–61 n.15; *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, supra, 216 Conn. 640. Moreover, on the basis of Carver's testimony, the arbitration panel reasonably could have concluded that the suggested additional repair attempts would not have produced a finish that met factory paint specifications. We conclude, therefore, that the record contains substantial evidence to support the panel's conclusion that, under the circumstances, Maritime's attempt to replace the truck's hood constituted a reasonable number of repair attempts as required by § 42-179 (e).

III

The plaintiff next claims that the arbitrators improperly concluded that the paint defects substantially impaired the value of the truck to the defendant. Specifically, the plaintiff maintains that: (1) the standard for

"substantial impairment" under § 42-179 (d) incorporates both a subjective and an objective component and (2) the record does not contain substantial evidence to support the arbitrators' finding that the defects in the truck's paint substantially impaired its value to the defendant within the meaning of § 42-179 (d). Although we agree that § 42-179 (d) incorporates a mixed subjective and objective standard, we do not agree that the record lacks substantial evidence to support a finding that the defects in the truck's paint substantially impaired its value to the defendant.

A

Interpretation of the phrase "substantially impairs the . . . value of the motor vehicle to the consumer" in § 42-179 (d) is a matter of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Jupiter Realty Co.* v. *Board of Tax Review*, 242 Conn. 363, 367–68, 698 A.2d 312 (1997); *Ferrigno* v. *Cromwell Development Associates*, supra, 244 Conn. 195.

Our analysis begins with the language of § 42-179 (d). Section 42-179 (d) provides in relevant part: "If the manufacturer, or its agents or authorized dealers are unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which *substantially impairs the . . . value of the motor vehicle to the consumer* . . . the

manufacturer shall replace the motor vehicle . . . ." (Emphasis added.) The phrase "to the consumer" in § 42-179 (d) suggests that the needs and expectations of the individual consumer should be considered in a determination of whether a defect has substantially impaired the value of a vehicle. That language, therefore, suggests that the legislature intended to incorporate a subjective component into the determination of "substantial impairment" under § 42-179 (d).

Other language contained in § 42-179 (d), however, indicates that the standard for "substantial impairment" was intended to incorporate an objective component as well as a subjective component. Specifically, § 42-179 (d) provides that "*[i]t shall be an affirmative defense to any claim under this section . . . that an alleged nonconformity does not substantially impair such . . . value . . . .*" (Emphasis added.) The statutory provision that permits a manufacturer to show that the value of a vehicle has not, in fact, been substantially impaired, suggests that the subjective opinion of the consumer is not dispositive. If the standard were completely subjective, the manufacturer would almost never be able to prove lack of "substantial impairment," and thus, the right to prove that the value of the vehicle had not been substantially impaired would be meaningless. "We presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions. . . . Accordingly, care must be taken to effectuate all provisions of the statute." (Citations omitted; internal quotation marks omitted.) *Ferrigno* v. *Cromwell Development Associates*, supra, 244 Conn. 196; *State* v. *Szymkiewicz*, 237 Conn. 613, 621, 678 A.2d 473 (1996); see *State* v. *Spears*, 234 Conn. 78, 93, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).

Moreover, the legislative history of the lemon law and the circumstances surrounding its enactment indicate that the phrase "substantially impairs . . . the value of the motor vehicle to the consumer" in § 42-179 (d) was not intended to be read literally so as to incorporate only a subjective standard. The initial version of House Bill No. 5729, the bill that eventually was enacted as Public Acts 1982, No. 82-287, and codified as General Statutes § 42-179, provided: "If the manufacturer . . . [is] unable to conform the motor vehicle to any applicable express warranty . . . after a reasonable number of [repair] attempts, the manufacturer shall replace the motor vehicle . . . ." General Statutes (Rev. to 1983) § 42-179 (c). Thus, in order for a defect to constitute a nonconformity under the initial version of the bill, all that was required was a breach of an express warranty. Rather than expose automobile manufacturers to claims based solely on defects that, although trivial, constituted a breach of an express warranty, House Bill No. 5729 was revised to include the "substantial impairment" provision that exists currently.

During the committee hearings on the revised bill, Representative John J. Woodcock, the bill's sponsor, made two references to the addition of the "substantial impairment" language. 25 H.R. Proc., Pt. 10, 1982 Sess., pp. 3115–16. First, Representative Woodcock stated that the revised bill defined a nonconformity as "a defect or condition which substantially impairs the use of [sic] value of the motor vehicle." Id., p. 3115. No mention was made of the effect of the impairment on the consumer, indicating that the term "substantial impairment" was not intended to be measured by a purely subjective standard. Second, Representative Woodcock stated that the issue of whether a nonconformity qualifies under the "substantial impairment" standard could be raised as an affirmative defense by the

manufacturer. Id., p. 3115, remarks of Representative Woodcock ("the amendment creates affirmative defenses for the manufacturer which he may raise in response to a consumer complaint . . . [the manufacturer] can say there's a defect which is unrepairable [but] is not a substantial defect, and therefore the presumption should not rule against him"). Thus, Representative Woodcock's remarks supply further evidence that the legislature did not intend to adopt a completely subjective approach to determining "substantial impairment" under the lemon law.

Moreover, in the discussion of House Bill No. 5729 on the Senate floor, Senator Clifton A. Leonhardt remarked: "In my judgment, the genius of this bill is that it really takes [into account] the commonsense notion that a consumer should be able to return a lemon. *I think we all know by commonsense what a lemon is* . . . . So I really think the genius of this bill is to take the commonsense notion of fairness that [the consumer] shouldn't be stuck with a lemon [and translate] that concept of a lemon into the precision of tort law." (Emphasis added.) 25 S. Proc., Pt. 9, 1982 Sess., p. 2747. Senator Leonhardt's remarks that the concept of "commonsense" underlies the definition of a lemon in House Bill No. 5729 manifests an intention to incorporate objective criteria into the determination of "substantial impairment."

We note also that the phrase "substantially impairs the . . . value of the motor vehicle to the consumer" in § 42-179 (d) is analogous to a provision of the Uniform Commercial Code. Specifically, in the related context of revocation of acceptance of goods pursuant to General Statutes § 42a-2-608, we previously have interpreted the phrase "[t]he buyer may revoke his acceptance of a lot . . . whose nonconformity *substantially impairs its value to him* . . . ." (Emphasis added.) See *Web Press Services Corp.* v. *New London Motors, Inc.*, 203 Conn.

342, 346–47, 525 A.2d 57, following remand, 205 Conn. 479, 533 A.2d 1211 (1987); *Conte* v. *Dwan Lincoln Mercury, Inc.*, 172 Conn. 112, 120–21, 374 A.2d 144 (1976). In interpreting that statute, we have stated that "[t]he test for substantial impairment is both subjective and objective; it focuses first, on the needs and circumstances of the particular buyer . . . and then considers whether, from an objective standpoint, the value of the goods to the buyer has in fact been impaired." *Web Press Services Corp.* v. *New London Motors, Inc.*, supra, 346–47. We consistently have stated that the legislature is presumed to have knowledge of all existing statutes and the effect that its own action or inaction may have on them. *Connecticut Light & Power Co.* v. *Texas-Ohio Power, Inc.*, 243 Conn. 635, 648–49, 708 A.2d 202 (1998); *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, 229 Conn. 312, 321, 640 A.2d 101 (1994). Moreover, during the joint committee hearings on House Bill No. 5729, Representative Woodcock made direct reference to the "substantial impairment" provision of § 42a-2-608, as well as our decision in *Conte* v. *Dwan Lincoln-Mercury, Inc.*, supra, 112, in which we applied § 42a-2-608 to the attempted revocation of acceptance of an allegedly defective motor vehicle. Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1982 Sess., pp. 234–35. Thus, the legislature's use in § 42-179 of "substantial impairment" language that mirrors the language of § 42a-2-608 indicates that the legislature intended to create parallel standards.

Finally, common sense dictates that the legislature did not intend § 42-179 to incorporate a purely subjective standard. Such a standard inevitably would lead to absurd results by requiring manufacturers to replace vehicles that had only trivial defects, a result that clearly undermines the spirit and purpose of the lemon law. See id., p. 236 (lemon law designed to afford consumers

reasonable remedy); id., p. 268 (lemon law not concerned with trivial defects). "It is . . . a rule of statutory construction that those who promulgate statutes or rules do not intend to promulgate statutes or rules that lead to absurd consequences or bizarre results." (Internal quotation marks omitted.) *Ferrigno* v. *Cromwell Development Associates*, supra, 244 Conn. 201; *State* v. *DeFrancesco*, 235 Conn. 426, 437, 668 A.2d 348 (1995).

We recognize that "the Lemon Law is a remedial statute that ought to be read broadly in favor of those consumers whom the law [was] designed to protect. But a recitation of that general principle merely begs the question of *which* consumers the Lemon Law was, in fact, designed to protect." (Emphasis in original.) *Cagiva North America* v. *Schenk*, 239 Conn. 1, 14, 680 A.2d 964 (1996). Given the lemon law's language, legislative history and close relationship to § 42a-2-608, we are not persuaded that its remedial purpose is broad enough to require a purely subjective standard for determining "substantial impairment." We conclude, therefore, that under the lemon law the standard for determining whether a defect substantially impairs the use, safety or value of a motor vehicle to the consumer is both subjective and objective. The standard is subjective in that the fact finder first must examine the subjective desires, needs and circumstances of the particular consumer. In light of those desires, needs and circumstances, the fact finder then must make an objective determination as to whether the value of the motor vehicle to the consumer has, in fact, been substantially impaired. In making this determination, the fact finder must determine that the consumer's subjective desires, needs and circumstances are reasonable.

### B

Having articulated the standard for substantial impairment under the lemon law, we address the plaintiff's claim that the record does not contain substantial

evidence to support a finding that the evident defects in the paint substantially impaired the truck's value to the defendant.[10]

During the arbitration hearing, the defendant testified that he takes great pride in the appearance of the vehicles that he owns and maintains the finish of those vehicles in factory condition. Moreover, he stated that appearance was a major factor in his decision to purchase a new truck rather than a used one. On the basis of that testimony, the arbitrators reasonably could have concluded that, had the defendant known of the defects in the paint before accepting delivery, he would not have purchased the truck, and that the statutory requirement of subjective substantial impairment had been satisfied.

Carver, the state's technical expert, testified that, on a scale of one to ten, with ten representing the worst amount of damage, the damage to the truck constituted a three. Carver further stated that the paint defects could not be removed easily. Moreover, Carver corroborated the defendant's contention that wet sanding and repainting the truck would remove its finish. Finally, Carver stated that the paint defects possibly could affect the resale value of the vehicle and that if the vehicle was not maintained meticulously, the affected areas could deteriorate further. Thus, on the basis of Carver's testimony, the arbitrators reasonably could have concluded that the statutory requirement of objective substantial impairment had been satisfied.

---

[10] Section 42-181 (c), the statutory provision that governs our review of lemon law arbitration proceedings, provides in relevant part: "If the arbitrators fail to state findings or reasons for the award, or the stated findings or reasons are inadequate, the court shall search the record to determine whether a basis exists to uphold the award. . . ." Consequently, we review the record in order to determine, in accordance with the appropriate subjective and objective standard, whether the arbitration panel reasonably could have determined that the defects in the truck's paint substantially impaired its value to the defendant.

We conclude, therefore, that the record contains substantial evidence to support a finding that the defects in the truck's paint substantially impaired its value to the defendant within the meaning of § 42-179.

The judgment is affirmed.

In this opinion the other justices concurred.