**Marina MILICEVIC, Plaintiff(s),**

v.

**MERCEDES–BENZ USA, LLC, et al., Defendant(s).**

**No. CVS00020471RLHLRL.**

United States District Court, D. Nevada.

Feb. 14, 2003.

Christopher G. Gellner, Las Vegas, NV, Dale E. Haley, Dale E. Haley, Law Office of, Las Vegas, NV, for Milicevic, Marina, Plaintiff.

Howard M. Miller, Las Vegas, NV, Robert A. Nersesian, Robert Nersesian, Law Office Of, Las Vegas, NV, for Fletcher Jones Imports, Ltd, Mercedes–Benz USA, Defendants.

## MEMORANDUM DECISION FINDINGS OF FACT CONCLUSIONS OF LAW and JUDGMENT

HUNT, District Judge.

The Court having tried the above-entitled by a bench trial on February 3–5, 2003, the parties having appeared by and through their respective counsel, and the Court having heard the testimony of witnesses and having considered all exhibits accepted into evidence at trial, and the authorities provided by each side post trial, the Court now renders its Decision, Findings of Fact, Conclusions of Law, and Judgment, as follows:

### FINDINGS OF FACT

1. On May 11, 2001, the Plaintiff, Marina Milicevic, purchased a 2001 Mercedes S–500 automobile, VIN MDBNG75JX1A211163, from Fletcher Jones Imports, Ltd. for $95,722.25, including the price of the vehicle, all taxes and other fees referenced on the auto sales order.

2. Plaintiff payed cash for the motor vehicle, and the vehicle was titled in her name.

3. Defendant Fletcher Jones Imports, Ltd. is a Nevada corporation which is an authorized dealer of Defendant Mercedes Benz, USA, LCC, the manufacturer and distributer of the vehicle purchased by Plaintiff.

4. When Plaintiff inspected the vehicle pre-delivery on May 10, 2001, she noted that it was dirty and had not been detailed as she expected. Fletcher Jones directed her to return the next day after they had an opportunity to detail the car. The following day, on May 11, 2001, when she returned to pay for and pick up the vehicle, it was noted that there was a large paint blotch in the paint of the passenger side-view mirror. Even so, Plaintiff paid for the vehicle in full and drove it off the lot on this date, on the representation that Fletcher Jones would replace the passenger side-view mirror as soon as a replacement part could be ordered and delivered.

5. The total purchase price of the vehicle, including taxes and fees on delivery, was $95,722.25. Additionally, Plaintiff paid $1283.26 to register the vehicle in May 2001, and $1,218.00 in May 2002, for a total of $98,223.51.

6. After Fletcher Jones notified Plaintiff that the replacement passenger side-view mirror had arrived, she took the vehicle in for the repairs on May 18, 2001. In the meantime, between the date she took possession of the vehicle and returned for the repairs, Plaintiff discovered that the weather stripping around the rear window was bubbling, distorted and coming off. She reported the problem to the service

department which agreed that the stripping or molding was defective and that it would replace the molding on the rear window. Plaintiff also reported at this visit that the brakes did not activate until the pedal was almost to the floor.

7. Upon the representation that a part would have to be ordered for the rear window, but that it would be delivered in a few days, Plaintiff agreed to leave the vehicle with Fletcher Jones so it could be repaired immediately upon receipt of the part and to avoid the inconvenience of having to arrange to return the car to the dealer. She was also concerned that the defective weather stripping might jeopardize the interior during rain or washing. She was told later that Fletcher Jones had ordered the wrong part and the repairs would be delayed. The delay resulted in Fletcher Jones having possession of the vehicle for 33 days, from May 18, 2001, and June 20, 2001, to replace the side view mirror, attempt to repair the weather stripping around the rear window, and test the brakes for defects. When Fletcher Jones finally returned the vehicle, the seal around the rear window was off center and loose, and the brakes would not provide sufficient stopping power until they were almost pushed to the floor. The records reflect that Fletcher Jones spent only one minute checking or testing the brakes in response to the complaint that the brakes did not activate until the pedal was almost to the floor. The condition with the brakes caused Plaintiff to lose confidence in the safety of the automobile and the testimony of Defendants' witness at trial claimed it could not be adjusted or corrected.

8. The vehicle was brought back to Fletcher Jones for further repairs on September 20, 2001, after the weather stripping/molding on the right side of the rear window came off. The vehicle remained in Fletcher Jones' possession for 17 days from September 20, to October 8, 2001, while the service department replaced, or arranged for the replacement of, the trim and molding around the rear window as well as the broken body clips that hold the rear window in place. When Plaintiff brought the vehicle in on September 20, 2001, she also complained that the vehicle had a bumpy ride at freeway speeds, particularly when she would apply the brakes, and that the vehicle pulled to the left.

9. When Plaintiff picked the vehicle up on October 10, 2001, she noticed that the lower seal of the rear window was higher on the right side and poorly adjusted. She also noticed that the rear window seal looked worse than when the vehicle had been brought for repair 2½ weeks earlier. She was told that was the best Fletcher Jones could do, and that they were unable to make it look any better.

10. Because Plaintiff was extremely distraught and frustrated with Fletcher Jones' inability to make the repairs to the rear window and brakes, Mr. Christopher Gellner, the Plaintiff's fiancé, contacted Defendant Mercedes Benz, for assistance. On October 10, 2001, Mr. Gellner telephoned the warranty assistance center stating that the weather stripping around the rear window was coming apart and causing there to be a gap between the seal and the rear window, that he believed the problem was a manufacturing defect, and that Fletcher Jones could not fix the problem. He further stated that Ms. Milicevic wanted her money back or a new car if Fletcher Jones could not resolve the problem.

11. After Mr. Gellner's complaint to the customer service center, he was contacted by Mr. Brad Tyler of Fletcher Jones who requested that the vehicle be brought back in for further repairs. Mr. Tyler indicated that Fletcher Jones would take the rear glass out and replace it with new weather stripping and that would

solve the problem with the defective window seal. Mr. Tyler stated that the reason the car was never repaired properly is because they never took the glass out. Mr. Tyler offered to pay Plaintiff $1,200.00 on behalf of Fletcher Jones as a goodwill gesture for the vehicle being out of service so long. Plaintiff accepted the money.

12. The vehicle was brought back for the additional window repairs on October 15, 2001. At this time, Plaintiff also informed the dealership that her remote unlock key would only work sporadically. In addition to attempting to perform the rear window repairs, Fletcher Jones replaced the remote door entry key after diagnosing an electrical fault. The car was at Fletcher Jones for two days for these repairs.

13. When Ms. Milicevic arrived at Fletcher Jones' on October 18, 2001, to pick up the vehicle after the repairs, she found the rear window to be in poor condition. It was elevated in the left corner and the weatherstripping on the right corner did not fit properly. Mr. Tyler then compared the rear window of Ms. Milicevic's vehicle with rear windows of other S–500s on the lot and concluded that the fit and trim of the rear window of Plaintiff's vehicle were substandard. Ms. Milicevic was told that this was a factory defect and there was essentially nothing they could do to correct the problem.

14. Also, when Ms. Milicevic picked up the car on October 18, 2001, and attempted to drive it off the lot, the passenger-side window would not close and would bounce up and down. Fletcher Jones retained the vehicle for an additional four hours to replace the passenger side window motor which had an electrical fault.

15. Plaintiff again returned to the service department on December 3, 2001, because of continuing problems with the brakes, and rear window seal. The brakes would not activate until the pedal was almost to the floor and there was shaking or pulsating of the car in normal brake application. The car had a bumpy ride and pulled to the left on the freeway. Also, the heater was emitting smoke and an odor into the vehicle when put on the high setting.

16. During the December 3, 2001, visit, the service department of Fletcher Jones determined that all four brake rotors were warped, and replaced the rotors and pads on all four wheels. According to the testimony of Ms. Milicevic, this was the fourth time the vehicle had been brought in with complaints about the brakes (5/18/01; 9/20/01; 10/8/01 [1]; 12/3/01). After verifying that the heater was emitting smoke and odor while on the high setting, Fletcher Jones replaced the expansion valve and evaporative core of the heater. Nothing was done, or even attempted, to correct the rear window seal problem despite the fact that this was the fourth time the car had been brought in for that problem (5/18/01; 9/20/01; 10/15/01; 12/03/01). The vehicle was in the shop and unavailable for use by Plaintiff from December 3, to December 5, 2001, before it was returned.

17. The vehicle was in Fletcher Jones' service department for warranty repairs for 55 days between May 11, 2001, the date of delivery, and December 5, 2001, for repairs. The down time constituted 27% of the total time, since the car had been delivered.

18. Additionally, between May 18, and December 5, 2001, the defect in the rear window seal/molding had been subject to repair four times by Fletcher Jones, Mercedes–Benz's authorized dealer, and De-

---

**1.** Although the Defendant's invoice does not note the complaint, Plaintiff testified that she complained about the brakes on this occasion as well.

fendants were unable to completely repair or correct the problem.

19. The maladjustment and/or the malalignment of the rear window seal and molding diminishes the esthetics, and therefore the value, of a luxury car, costing nearly $100,000 and touted as "the best car in the world," which would "heighten the senses" and "shape the future." Further, the existence of problems with the brakes and the obligation to disclose the numerous problems occurring in the early months of the car's ownership would undoubtedly diminish its resale value, not to mention destroy the buyer's confidence in the quality and safety of the vehicle, impairing its use and value to the Plaintiff-buyer.

20. The defects or conditions causing the non conformities in the rear window, brakes, remote door key, heater, and passenger-side window and mirror, substantially impaired the use and value of the vehicle to Plaintiff, and Plaintiff's complaints and demand for a refund are reasonable.

21. The Mercedes–Benz new car warranty, which applies to the 2001 S–500 automobile sold to Marina Milicevic by Fletcher Jones, warrants to the original and each subsequent owner of the vehicle that any authorized Mercedes–Benz Center will make any repairs or replacements necessary to correct defects in material or workmanship for the duration of the warranty.

22. The testimony and documents show the following visits, complaints and repairs relating to the vehicle in question:

### BEFORE DEMAND AND SUIT

| Dates | Complaints/Problems/Defects/Repairs | Number of Days |
|---|---|---|
| 5/18–6/20/2001 | Flaw in paint<br>Rear window seal bubbling/distorted<br>Brake pedal goes low | 33 days |
| 9/20–10/8/2001 | Rear window molding coming off<br>Vehicle has bumpy ride at freeway speeds, especially when braking<br>Pulls to left at freeway speeds | 17 days |
| 10/15–10/16/2001 | Rear window seal needed adjusting<br>Brakes (per Plaintiff's testimony)<br>Remote Control for locks malfunctioning | 2 days |
| 10/18/2001 | Passenger window bouncing/new motor installed | 1 day |
| 12/3–12/4–2001 | Brakes bumpy, etc.(4 warped rotors, pads replaced)<br>Rear window seal off center<br>Heater odor/smoke (evaporative core and expansion valve replaced) | 2 days |
| | | 55 days total |

### POST FILING OF SUIT

| | | |
|---|---|---|
| 8/28–29/2002 | Computer failure-replaced module<br>Brake squeaking and rubbing noises | 2 days |
| 10/2–4/2002 | Check Engine Light on<br>Whining noise, power steering pump and hose replaced<br>Wheel alignment | 3 days |

23. All of the defects, conditions and non-conformities complained of by Plaintiff, with respect to the automobile, and which Fletcher Jones repaired or attempted to repair, during the first seven months after the vehicle's delivery, were covered by the Mercedes–Benz new car warranty.

24. Mercedes Benz has an informal dispute resolution procedure under the Lemon Laws which is contained on page 33 of the service and warranty information booklet which was provided to Plaintiff when she purchased her vehicle. This procedure requires that a purchaser first provide Mercedes–Benz with written notification of any alleged unrepaired defect or malfunction prior to taking action to obtain a replacement vehicle or a refund of the purchase price under Federal or State law.

25. On January 14, 2002, Mr. Gellner, on behalf of Ms. Milicevic, wrote a notification letter to Mercedes–Benz under the dispute resolution procedures of the Mercedes–Benz warranty and, as required by the Lemon Laws, setting forth the problems with the vehicle and that Plaintiff wished to exercise the relief she was entitled to under the Nevada law by receiving a replacement vehicle or a refund of her money.

26. On January 23, 2002, Kathleen Durning, a customer relations representative of Mercedes–Benz, wrote Mr. Gellner a letter in response to his notification letter stating, "your client's authorized Mercedes–Benz dealership in conjunction with our regional manager is in the best position to address matters of this nature on behalf of Mercedes–Benz. Arrangements have been made for your concerns to be reviewed on a local level. You may expect further contact shortly, if not already."

27. Thereafter, neither Mr. Gellner nor Ms. Milicevic was contacted by the regional manager, his representative, or any other person on behalf of Mercedes–Benz or Fletcher Jones to discuss and/or resolve the matters set forth in his letter of January 14, 2002.

28. Between January 14, 2002, and May 7, 2002, Mr. Gellner telephoned Ms. Durning on several occasions to determine why he had not been contacted and what Mercedes–Benz and Fletcher Jones' positions were on resolving the matter. He left repeated messages for Ms. Durning to return his call; however, he never received a return call.

29. Consequently, on March 7, 2002, Plaintiff filed her Complaint with the District Court, Clark County, Nevada, asserting breach of warranty and for relief under the Nevada Lemon Law and the Federal Magnuson–Moss act.

30. The records reflect that Plaintiff drove the automobile an average of less than 1,000 miles per month. Her use of the vehicle was neither excessive nor abusive. Accordingly, she had use of the car from May 2001 to January 2002, when the demand for a replacement or refund was made, less the 55 days it was out of service. The only amount attributable to the value of the use for that time is the $1,200.00 paid for "down time" of approximately two months. The Court, therefore, finds that the value of the use of the vehicle to be $600.00 per month for eight months, or $4,800.000. Since Plaintiff was reimbursed for the 55–day period, the value of her use will be calculated for the full eight months.

### MEMORANDUM [2]

Because there is a paucity of Nevada Supreme Court and Ninth Circuit deci-

---

**2.** Flaunting convention, the Court has chosen not to "block" or set apart, some long quotations in the memorandum, hoping to facilitate the decision's flow. The Court is also aware that placement of the memorandum here is

sions addressing either the state "lemon law" (Nevada Revised Statutes 597.600–.670) or the federal "lemon law" (15 U.S.C. § 2301 *et seq.*), the Court has been relegated to examining the decisions of other jurisdictions for guidance in the interpretation of the two acts. The Court has particularly noted Wisconsin decisions. The Wisconsin lemon law is very similar to, if not identical to, Nevada's lemon law. However, the analysis and decisions of other courts have also served to provide persuasive instruction for deciding the case at hand.

█ A review of all the cases provided, post trial, by the parties, persuades the Court that Nevada's lemon law is a remedial statute that should be read broadly in favor of the consumers the law was designed to protect, *Cf. General Motors Corp. v. Dohmann,* 247 Conn. 274, 722 A.2d 1205, 1214 (1998), and is entitled to a liberal construction in favor of those who are the intended beneficiaries of the legislation. *Cf. Muzzy v. Chevrolet Div., GMC,* 153 Vt. 179, 571 A.2d 609, 614 (1989). "Remedial statutes should be liberally construed to suppress the mischief and advance the remedy that the statute intended to afford." *Nick v. Toyota Motor Sales, U.S.A., Inc.,* 160 Wis.2d 373, 466 N.W.2d 215, 218 (Wis.App.1991).

The provision of Nevada's lemon law which is most pertinent here is NRS 597.630, which provides, in relevant part, as follows:

"1. If, after a *reasonable number of attempts,* the manufacturer, or its agent or authorized dealer *is unable to conform the motor vehicle to any applicable express warranty by repair or correction and the defect or condition causing the nonconformity substantially impairs the use and value of the motor vehicle to the buyer* and is not the result of abuse, neglect, or unauthorized modifications or alterations of the motor vehicle, the manufacturer shall:

(a) Replace the motor vehicle . . .; or

(b) Accept return of the motor vehicle from the buyer and refund to him the full purchase price including all sales taxes, license fees, registration fees [etc.] . . . less a reasonable allowance for his use of the vehicle. * * *

2. It is *presumed* that a reasonable number of attempts have been under taken to conform a motor vehicle to the applicable express warranties where:

(a) *The same nonconformity has been subject to repair four or more times . . . within the time the express warranty is in effect or within 1 year . . . whichever occurs earlier,* but the nonconformity continues to exist; or

(b) *The motor vehicle is out of service for repairs for a cumulative total of 30 or more calendar days within the time the express warranty is in effect or within 1 year . . . whichever occurs earlier. . . .* " (Emphasis added)

The statute must be interpreted with respect to four issues presented by this case: (1) What is a reasonable number of attempts? (2) What constitutes substantial impairment and is the test subjective or objective? (3) Must the nonconformity be ongoing? (4) What is the effect of the presumption?

█ The Court is in agreement with those decisions which hold that under some circumstances a single attempt, or no attempt at all, can be a reasonable number. If, for example, the manufacturer or dealer refuses to repair or correct, claiming there is no defect, or after a single repair takes the position that further repair would be unnecessary or unavailing, the buyer is not precluded from exercising

also unconventional, but feels it is more appropriate.

his or her right under the lemon law because the manufacturer or dealer refuses to make further (or any) attempts. Likewise, where any repair will not restore the vehicle to its new condition. *Cf. General Motors Corp. v. Dohmann, supra,* (holding that a dealership's paint repair of a truck's hood was inferior to the conditions under which the factory originally paints the vehicle).

Defendants' testimony and arguments implied that, as long as the vehicle runs and will get the buyer from point A to point B, they have fulfilled their obligations under the warranties, express or implied. Such an argument is spurious at best. When a buyer pays for a Mercedes the dealer/manufacturer is obligated to provide more than a compact Chevrolet. What, then, is the test for substantial impairment?

■ The statute's test is whether the nonconformity substantially impairs the use and value of the motor vehicle *to the buyer.* Plaintiff urges that the test is purely subjective. Defendants argue that it must be purely objective. This Court disagrees with both. Rather, the test is "reasonably subjective," that is, it is both subjective and objective, but "the choice of wording is more consistent with a subjective standard than an objective one." *Muzzy,* 571 A.2d at 614. "The standard is subjective in that the fact finder first must examine the subjective desires, needs and circumstances of the particular customer. In light of those desires, needs and circumstances, the fact finder then must make an objective determination as to whether the value of the motor vehicle to the consumer has, in fact, been substantially impaired. In making this determination, the fact finder must determine that the consumer's subjective desires, needs and circumstances are reasonable." *Dohmann,* 722 A.2d at 1214.

If the dealer/manufacturer has made a repair, but the consumer is not satisfied, "and that dissatisfaction was real and not feigned, honest and not pretended, it is enough, and [the manufacturer/dealer] have not fulfilled their contract...." *Muzzy,* 571 A.2d at 614.

■ "Although the [manufacturer] seeks to trivialize the importance of the problem by stating it operates within factory standards or represents it as normal [the condition] not only interferes with the owner's enjoyment and use of her new car, but will affect its safety and value." *Berrie v. Toyota Motor Sales, USA, Inc.,* 267 N.J.Super. 152, 630 A.2d 1180, 1181 (1993). "[T]he purchase of an automobile is a 'major high cost consumer transaction,' and ... 'the inability to correct defects in these vehicles creates a major hardship and an unacceptable economic burden on the consumer.' " *Id.* "It may be 'personalized in the sense that the facts must be examined from the viewpoint of the buyer and his circumstances, objective in the sense that the criterion is what a reasonable person in the buyer position would have believed.' [citations omitted] An important factor is whether the nonconformity 'shakes the buyer's confidence' in the goods.' [citation omitted]." *Id.* The buyer is not required to rely on the seller's assurances that all is right. No expert is required to testify that the nonconformity substantially impairs the value and use of the vehicle to the buyer. The buyer is quite capable of testifying to the facts and her expectations. The fact finder will determine if the dissatisfaction is reasonable.

" 'Nonconformity' is defined as 'a nonconformity which substantially impairs the use, value, or safety of the new motor vehicle to the buyer or lessee.' [statute citation omitted] The term is similar to what the average person would understand to be a 'defect.' " *Schreidel v. American*

*Honda Motor Co., Inc.,* 34 Cal.App.4th 1242, 40 Cal.Rptr.2d 576, 579 (1995).

It goes without saying that the Court, as the fact finder in this case, will determine whether the condition of the vehicle substantially impairs the use and value of the vehicle to the buyer, and whether the impairment in the mind of the buyer is reasonable. The Court finds that a reasonable buyer would be of the opinion that the condition of the vehicle substantially impairs its use and value to the buyer.

"Under these facts, we think it clear that the plaintiff's confidence in the reliability and integrity of his new automobile was severely undermined. He had bargained for a new car.... The plaintiff is correct in this assertion that a new automobile is more than the sum of its various components. It is the integrity of the vehicle as a whole which is the essence of the consumer's bargain, ... [the buyer] assumed what every new car buyer has a right to assume and, indeed, has been led to assume by the high-powered advertising techniques of the auto industry-that his new car, with the exception of very minor adjustments, would be mechanically new and factory-furnished, operate perfectly, and be free of substantial defects." *Champion Ford Sales, Inc. v. Levine,* 49 Md.App. 547, 433 A.2d 1218, 1223 (1981).

■ Furthermore, it is unnecessary for the nonconformity to be ongoing where the presumption is invoked by the vehicle having been out of service for more than 30 days. "We conclude that [the statute] does not require that the car continue to have the nonconformity in order for the consumer to demand a refund when the car has been out of service for an aggregate of at least thirty days.... To allow the automotive dealer to continue repair efforts beyond the thirty-day period would eviscerate the remedies provided by the statute and allow the manufacturer to effect repairs beyond the time period specifi-

cally set forth in the statute." *Nick v. Toyota Motor Sales, U.S.A., Inc.,* 160 Wis.2d 373, 466 N.W.2d 215, 218 (Wis.App. 1991) (addressing a statute similar or identical to Nevada's).

■ The issue is moot in the case at bar, because the Court has found that the rear window deformity continues even after four attempts, and there appears to be evidence that there are also remaining problems with the brakes. Furthermore, the vehicle was out of service for not merely 30 days, but for 55 days. There is no requirement that the vehicle be out of service for 30 days for just one problem, although that is the case here. If an aggregation of problems requires the vehicle to be out of service for at least 30 days, the presumption still applies.

It is clear that once Plaintiff has presented a preponderance of evidence to raise the presumption, the presumption applies. Here, it applies with respect to two non conformities. Once the presumption applies, Defendants are obligated to come forward with sufficient evidence to rebut the presumption. The evidence is wholly insufficient to rebut either presumption.

Defendants argue that Plaintiff voluntarily left the vehicle with Fletcher Jones while the part was being ordered, and that she could have taken the car and returned when the part came in. However, the evidence is that she left it on the promise that the part would be coming and installed in a few days; that she was later told the dealer had ordered the wrong part (which is also suggested by comparing her complaint, and the mechanic's observations, with the part that was ultimately replaced and the fact that the part which was the subject of the original complaint continued to be a problem); and that there would be a delay in delivery. Not knowing how long the delay would be, Defendants,

who had control of the delay, and not Plaintiff, were responsible for the vehicle being out of service for 33 days until the part was delivered and installed. Where the 30–day out-of-service period is caused by the unavailability of parts, the presumption is still met. *Ayer v. Ford Motor Co.*, 200 Mich.App. 337, 503 N.W.2d 767, 770 (1993).

■ Defendants further argue that the nonconformity in the rear window is either nonexistent or is so minor as to be insignificant. They cite Plaintiff's own words that "it was not that big of a deal." However, the context of that statement dealt with the issue of whether it posed a safety factor and whether she could live with it if she had to. It does not contradict the fact that Fletcher Jones' own service manager opined that it was a factory defect, and Fletcher Jones thought it was of sufficient significance that it ordered new parts and made four attempts to correct the defect.

Even more compelling is the clear fact that Ms. Milicevic did not get the motor vehicle she bargained for, or thought she was getting, or was represented she was getting, combined with the fact that she was presented not only with two significant nonconformities, but, in the aggregate, received a vehicle that has had, and appears to continue to have, a multitude of problems the average, reasonable buyer would not, and should not, expect to experience in a new luxury car. When a buyer pays that much for a car, she has the right to one that is unblemished, even if the blemish is cosmetic and not structural. The car is a lemon!

The federal lemon law is found specifically at 15 U.S.C. § 2304. While this statute generally provides for refund or replacement of a defective vehicle, it does not provide for the same presumptions to apply. Given the fact that all the repairs were acknowledged to be applicable to and under the warranties, the Court finds that Defendants also violated the federal lemon law. However, recovery will be awarded under the Nevada lemon law. The significance of the federal law is that it also provides, when a violation is found, that Plaintiff may recover costs and attorneys' fees. 15 U.S.C. § 2310(d)(2). *See also, Champion Ford Sales, Inc. v. Levine*, 49 Md.App. 547, 433 A.2d 1218, 1226 (1981).

Of final note, because Defendants argued that the $1,200.00 given Plaintiff as reimbursement for the "down time" of the vehicle constituted either a waiver of her claims, or accord and satisfaction, the Court finds that neither occurred. Nevada Revised Statute 597.660 voids any such waivers, and, since a loaner car was not provided, the evidence does not sustain an argument that the $1,200.00 was for anything but reimbursement for the down time the vehicle was out of service. The loaner car was not provided because the dealer thought the vehicle would only be out of service for a few days which disqualified the Plaintiff from the use of a loaner vehicle.

*CONCLUSIONS OF LAW*

1. The Court has jurisdiction of the above-referenced action under 28 U.S.C. § 1446(a) and 15 U.S.C. § 2310(d)(3)(B) and over the state claims pursuant to its pendant jurisdiction.

2. Plaintiff is entitled to relief under Nevada's lemon law, NRS 597.630, against Defendant Mercedes–Benz, USA, LLC, and/or its authorized dealer, Fletcher Jones Imports. The Court finds that after a reasonable number of attempts, Mercedes–Benz' authorized dealer, Fletcher Jones, was unable to conform Plaintiff's 2001 S–500 automobile to the applicable express (and/or implied) warranty by repair or correction of the defects or conditions causing the nonconformities as described in the Findings of Fact and

Memorandum set forth above, and these nonconformities substantially impaired the use and value of the motor vehicle to Plaintiff and are not the result of abuse, neglect, or unauthorized modifications or alterations of the motor vehicle.

3. There is a presumption that a reasonable number of attempts have been undertaken to conform the motor vehicle to the applicable express warranty because Plaintiff's vehicle was subject to repair four or more times between May 18, 2001, and December 5, 2001, for the defective rear window seal and molding and problems with the braking system, and Fletcher Jones was unable to repair or correct the defects or conditions. Additionally, Ms. Milicevic's motor vehicle was out of service for repairs for a cumulative total of 30 or more calendar days within the time the express warranty was in effect or within one year following the date the motor vehicle was delivered to her. In fact, the motor vehicle was out of service for repairs 55 days between May 18, and December 5, 2001, during the first year. The evidence is sufficient to establish the presumption provided for by state law, which has not been successfully rebutted by Defendants, and there is also a preponderance of evidence sufficient to warrant relief for Plaintiff.

4. The Court also concludes that Plaintiff is entitled to relief under the Federal Magnuson–Moss Warranty Act, 15 U.S.C. § 2304, because Ms. Milicevic's vehicle continued to contain defects or malfunctions after the warrantor had a reasonable number of attempts to remedy the defects or malfunctions.

5. The Court finds that Plaintiff was not obligated to follow the informal dispute resolution procedures found in Mercedes–Benz' written warranty, because it would have been futile to do so and/or Mercedes–Benz made it impossible to do so by failing to contact Plaintiff's counsel, Mr. Gellner, to resolve the problems, after his letter of January 14, 2002, which notified the manufacturer of Plaintiff's problems and requested the remedy of replacement or refund.

6. The Court also finds that Ms. Milicevic did not waive her rights under either the Federal lemon law or the State lemon law by accepting the $1,200.00 check on or around October 9, 2001. The check was offered by Fletcher Jones as a good will gesture for down time and Plaintiff accepted the check in partial payment for not being able to use the vehicle. Plaintiff's rights under either law were not discussed or considered in the offer, or acceptance, of the money and so there can be no waiver. Additionally, Nevada law, NRS 597.660, prohibits and makes void agreements between the manufacturer, or its agent or authorized dealer, and the buyer which provides that the buyer agrees to waive or forego any rights afforded by the Nevada statute. Furthermore, 15 U.S.C. § 2308(c) prohibits any disclaimers, modifications or limitations with respect to the Magnuson–Moss Warranty Act in violation of the law.

7. The Court finds that the Defendants' performance of all repairs and attempted repairs under the warranty provisions constitutes an admission that all the conditions testified to, during the relevant period, came within Defendants' warranties and that the failure to repair or bring the conditions into conformity constitutes a breach of those warranties.

8. The Court concludes that since the Plaintiff has no faith in the reliability or quality of a replacement vehicle or the ability of Defendants' to provide a conforming vehicle, or to make a nonconforming vehicle conform to promised specifications, she is entitled to a full refund of her purchase price including all taxes and fees, as permitted by Nevada law, in the

amount of $98,223.51, (representing the purchase price of $95,722.25, plus the registration fee of $1,283.26 for May 2001 and the registration fee of $1,218 for May 2002) less $600 per month for a period of eight (8) months, in the amount of $4,800, for a total recovery of $93,423.51.

9. Additionally, Plaintiff is entitled to an award of her costs under both federal and state law and is entitled to an award of attorneys' fees under federal law, based on actual time reasonably required to be expended, incurred by the Plaintiff for, or in connection with, the commencement and prosecution of this action.

10. If any Finding of Fact is considered to be a Conclusion of Law, or any Conclusion of Law is considered to be a Finding of Fact, it is the Court's intention that it be so considered.

### JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Plaintiff Marina Milicevic take judgment against Defendants Mercedes–Benz USA, LLC and Fletcher Jones Imports, Ltd. in the amount of $93,423.51, as and for a refund for the vehicle in question.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff immediately return the vehicle in question to Fletcher Jones Imports upon payment of the above judgment.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff recover costs and reasonable attorneys' fees, reasonably incurred.